**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| RAUL BARAJAS-ROMERO, *Petitioner*, <br><br> v. <br><br> LORETTA E. LYNCH, Attorney General, *Respondent*. | No. 13-70520 <br><br> Agency No. A017-190-075 <br><br><br> OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted April 7, 2014
Withdrawn from Submission August 19, 2014
Resubmitted July 30, 2015
San Francisco, California

Filed January 18, 2017

Before: Andrew J. Kleinfeld, Jacqueline H. Nguyen,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Kleinfeld

# SUMMARY[*]

## Immigration

The panel granted a petition for review, holding that the Board of Immigration Appeals erred in applying the REAL ID Act's "one central reason" nexus standard, rather than the "a reason" standard, to an application for withholding of removal, and improperly placed the burden on petitioner to prove that he could not safely relocate within Mexico for purposes of Convention Against Torture protection relief.

Declining to afford deference to the Board's precedential decision in *Matter of C-T-L*, 25 I. & N. Dec. 341 (BIA 2010), the panel held that by amending the asylum statute to include the REAL ID Act's "one central reason" nexus standard, but not similarly amending the withholding of removal statute, Congress did not intend for the "one central reason" standard to apply to withholding of removal claims. The panel explained further that the "a reason" standard applicable to withholding of removal claims requires weaker motives than the "one central reason" standard.

The panel held that there is no "rogue official" exception for CAT relief, and that an applicant need show a likelihood of torture at the instigation of or with the consent or acquiescence of either a public official, or some other person acting in an official capacity. The panel explained that CAT relief may be based on the actions of off-duty police officers, even where they were not acting in an official capacity, so

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

long as they carried out the acts or knowingly acquiesced in the acts.

The panel held that although petitioner bore the ultimate burden to prove a likelihood of torture, the Board erred by placing the burden on petitioner to establish that he could not safely relocate within Mexico to avoid future harm.

The panel remanded for the Board to reconsider the withholding claim applying the correct nexus standard, and to reconsider the CAT claim under the no-burden-shifting relocation standard.

## COUNSEL

Katherine Cheng (argued), Certified Law Student, UCLA School of Law, Los Angeles, California; Michael W. Reynolds (argued), and Carlos M. Lazatin, O'Melveny & Myers LLP, Los Angeles, California; for Petitioner.

Tim Ramnitz (argued), Attorney; Shelley R. Goad, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

KLEINFELD, Senior Circuit Judge:

We address the "principal reason" standard for withholding of removal, and also the acquiescence and relocation standards for Convention Against Torture relief. At issue is why Raul Barajas-Romero was tortured and whether he can be returned to Mexico without likely being tortured again.

## I. Facts.

Barajas-Romero came to the United States legally from Mexico as a little boy. He grew up in San Pedro, California. His mother, brothers, children, and grandchildren are American citizens, but he never became naturalized, and he remains a citizen of Mexico. Barajas-Romero was deported in 1998 because of convictions for felony methamphetamine possession and receiving stolen property.

After he was removed from the United States in 1998, Barajas-Romero got a house in Santa Clara, a village in the State of Michoacan, where he had relatives. Two years after he moved to the village, men attacked him and demanded his gold watch and everything in his pockets. He refused to hand them over, so the men hit him on the head, kicked him in the face, and threw him off a bridge. The assault left him with a broken nose, broken teeth, and a wound on his head requiring more than a dozen stitches and leaving a two- or three-inch scar. The men identified themselves by announcing: "Hey, puto, no one messes with the Familia Michoacana." Barajas-Romero's political opinion did not come up in this first

attack, just the Familia Michoacana drug cartel's pride in its power.

Barajas-Romero reported the assault to the police when he got out of the hospital. He told them La Familia Michoacana were the attackers. The police did nothing. His cousin was kidnaped by La Familia the following year. A couple of years after that, his next door neighbor, who had built a grand house, was murdered when he refused to pay extortion.

In 2006, Barajas-Romero was doing construction work on his house in Santa Clara when the incidents directly giving rise to this case occurred. Four off-duty local police officers arrived at his home. Barajas-Romero recognized them because he got off the bus daily at the police station stop, saw them frequently, and had frequently seen them following him. When he opened the door, the policemen forced him inside, locked the door behind them, and asked him for his money. Barajas-Romero said he had none, but they did not believe him, especially because they saw all the building materials he had purchased for his home.

The four policemen then locked Barajas-Romero in his own bathroom for two days while they deliberated about what to do with him. On the third day they took him out, told him to call his family for money, and began burning him with cigarettes. His leg was permanently scarred, and he later showed the twenty or so scars to the Immigration Judge. Barajas-Romero called his mother, who was in the United States, but she said she had no money she could send. The four policemen thought he could get money if they were more persuasive, so one of them began hitting him all over his body with the blunt side of a machete blade. Barajas-Romero

begged them to stop and said his mother was going to try to get money from his brothers.

However, Barajas-Romero did not merely beg. He also made a remark that annoyed the four policemen and could be construed as expressing or manifesting an anti-corruption political opinion. Barajas-Romero testified that he "got a little bold and told them even if I had the money I wouldn't give it to you guys because you guys are getting paid for the job, I don't pay no corrupt cops, nothing."

The torture became much worse after Barajas-Romero's "corrupt cops" remark. The four policemen threw him back in the bathroom, but this time they did not just leave him there. They lifted his pants and put two scorpions on his legs. Both scorpions stung. Barajas-Romero became feverish, swollen, and had trouble breathing.

While the policemen tortured him with scorpions, they also rubbed a dried corncob back and forth on his forehead to make him bleed and cause a permanent scar. They told him that if he told anyone what happened, they would put a bullet through his permanent scar. When Barajas-Romero begged for mercy, the policemen responded by threatening to cut his head off with a machete and slashed his leg, causing a deep laceration. Then they locked him in the bathroom again. Barajas-Romero could not move and passed out from pain, fever, and difficulty breathing.

The next morning the four policemen were gone, and Barajas-Romero stumbled out of his house. His neighbors tried to help him. A police officer arrived and asked what happened, and Barajas-Romero told him that his colleagues had done this. The police officer stopped preparing his

report, stopped talking to Barajas-Romero, and dropped him off him at the local clinic without saying a word. The police never asked Barajas-Romero to come in to identify the officers who had attacked him or for any other information regarding their identities. The local clinic where he had been dropped off refused to treat him once they learned that his torturers were police officers. A second medical facility likewise refused to treat him out of fear. Fortunately, a third hospital, one about an hour away from Santa Clara, did treat his injuries. He was hospitalized for two weeks. Approximately a month after his release, Barajas-Romero fled Mexico for the United States because he felt that he could not trust the police anywhere in Mexico, and the mark on his forehead would be, as his torturers had told him, where a bullet would go if he returned.

Barajas-Romero reentered the United States with a false passport and was eventually caught in 2010. Barajas-Romero was charged, convicted, and imprisoned for illegal reentry,[1] and then turned over to Immigration and Customs Enforcement ("ICE"). ICE commenced proceedings to reinstate his prior deportation order. These proceedings are the subject of the petition before us. Barajas-Romero was found statutorily eligible for withholding of removal and Convention Against Torture relief.

At his hearing before the Immigration Judge in 2012, Barajas-Romero provided medical evidence to support his claims. As one example, when Barajas-Romero's lawyer showed the Immigration Judge Barajas-Romero's leg, she said "may the record reflect . . . close to 20 cigarette burns or more on respondent's left leg." Government counsel

---

[1] 8 U.S.C. § 1326.

conceded that he saw perhaps 15 circular scars of some sort. Barajas-Romero's counsel then pointed to an exhibit, a physician's report saying that the scars were "typical purposeful cigarette burns . . . resemb[ling] the cigarette burns caused by torture." Similarly, a physician's report also confirmed a 12 centimeter (4 3/4 inches) scar on his leg consistent with a deep laceration, with consequential damage to the veins and chronic swelling of the leg. Barajas-Romero remains on medication for his physical injuries, and for the post-traumatic stress disorder caused by his torture. The Immigration Judge found Barajas-Romero to be credible, and none of the horrendous facts concerning Barajas-Romero's torture are in question. The issues in this case have to do with Barajas-Romero's right to remain in the United States because of his torture, not whether torture occurred.

The Immigration Judge denied Barajas-Romero's withholding of removal claim on the ground that the persecution "was solely an effort to extort money by rogue police officers and not because of an expressed or implied [or imputed] political opinion" and the threat came "solely from the off-duty, rogue officers themselves and not the government." He noted that Mexico has laws against torture and corruption, and thousands of police officers have been dismissed for violating them. As for the Convention Against Torture claim, the Immigration Judge determined that Barajas-Romero had the ability to find someplace "acceptable to his standards" of safety to live in Mexico.

The BIA agreed. While the BIA did not disagree that Barajas-Romero's testimony was credible, the BIA held that Barajas-Romero's withholding of removal claim failed because he failed to prove that the harm he suffered "was fueled by any political motives, even though . . . [Barajas-

Romero] expressed to his attackers that he was against police corruption. Rather, the attacks were designed to extort money." As for the Convention Against Torture claim, the BIA held that Barajas-Romero did not show "that any particular officer's actions or acquiescence would not be that of a rogue official." The BIA also held that "the country is aggressively targeting corrupt government elements" and that Barajas-Romero "could relocate out of the area."

Barajas-Romero petitions for review. First, he argues that the BIA applied an erroneous standard to his withholding claim. Second, he argues that the BIA failed to consider the Mexican government's lack of success in its war on gangs, and corruption and the nationwide danger facing him if he returned to Mexico.

## II. Analysis

### A. Withholding of removal.

The Attorney General must, in general, withhold removal of an alien if the alien's life or freedom would be threatened "because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."[2] Barajas-

---

[2] 8 U.S.C. § 1231(b)(3)(A):

> (A) In general

> Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

Romero argues that his life and freedom would be threatened, at least in part, because of his anti-corruption political opinion. There is ample evidence in the record that the local police and the local drug cartel targeted him without knowing anything about his political opinion, merely because they thought they could get money from him. There is also ample evidence that the police escalated their torture considerably, from confinement, beatings, and cigarette burns, to scorpions, slashing with a machete, and permanent conspicuous facial disfigurement, after he voiced his opposition to police corruption. The parties dispute the extent to which political opinion must be the basis for the threat for the threat to be "because" of the political opinion.

For purposes of asylum or withholding of removal, it is not enough that a person comes from a wretched place, where life will most probably be far worse than if he remains in the United States. For asylum, a person generally needs to face persecution in his home country "on account of race, religion, nationality, membership in a particular social group, or political opinion."[3] The person seeking asylum has the

---

[3] 8 U.S.C. § 1101(a)(42):

> The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 1157(e) of this title)

burden of proving not only the prospective persecution, but also that it would be "on account of" one of the five listed reasons.[4] A person seeking withholding of removal must prove not only that his life or freedom will be threatened in his home country, but also that the threat is "because of" one of the five listed reasons.[5] The list of reasons for which relief may be granted is identical for both asylum and withholding of removal.

---

may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

[4] 8 U.S.C. § 1158(b)(B)(1); 8 U.S.C. § 1101(a)(42).

[5] 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b).

The words "on account of" and "because of" address the persecutor's motive for persecuting the victim.[6] For example, if the persecutor has no idea what the victim's political opinion is and does not care what it is, then even if the victim does reasonably fear persecution, it would not be "on account of" the victim's political opinion. But what if the persecutor does have some idea of the victim's political opinion and feels quite hostile to that opinion, but also has other reasons for persecuting the victim? People, including persecutors, often have mixed motives. When is the persecution, motivated only in part by hostility to the victim's political opinion, "because of" or "on account of" that opinion?

We adopted the Second Circuit's position in our 1999 en banc decision in *Borja v I.N.S.*, holding that persecution "on account of" political opinion did not mean persecution *solely* for that reason.[7] The victim in that case sought asylum because Communist guerrillas in the Philippines had pointed a gun at her and threatened to kill her when she said she was pro-government, but were also upset that she could not pay the increased amount of monthly protection money they demanded.[8] They persecuted her partly because she was pro-government and partly just for the money.[9] We held that

---

[6] *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483 (1992); *Navas v. I.N.S.*, 217 F.3d 646, 656–57 (9th Cir. 2000).

[7] *Borja v. I.N.S.*, 175 F.3d 732, 735 (9th Cir. 1999).

[8] *Id.* at 734–35.

[9] *Id.* at 737.

persecution was "on account of" political opinion if it was so motivated "at least in part."[10]

Our "at least in part" standard is no longer the law with regard to asylum applicants. Congress amended the statute, so that for asylum, the victim's political opinion has to be "one central reason."[11] When we decided *Borja*, the statute did not indicate the appropriate burden of proof for establishing that persecution was "because of" (or "on account of") a protected ground.[12]  However, the asylum statute now states:

> the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be *at least one central reason* for persecuting the applicant.[13]

But Congress did not similarly amend the withholding of removal statute, and Barajas-Romero seeks withholding of removal, not asylum. The withholding statute just says "a" reason, not "at least one central reason:"

---

[10] *Id.* at 735–36.

[11] Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214; Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, PL 109–13, May 11, 2005, 119 Stat 231; 8 U.S.C. § 1231(3)(A).

[12] 8 U.S.C. § 1158 (1996) (current version at 8 U.S.C. § 1158 (2009).

[13] 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added).

> In determining whether an alien has
> demonstrated that the alien's life or freedom
> would be threatened for *a reason* described in
> subparagraph (A) [race, religion, political
> opinion, etc.], the trier of fact shall determine
> whether the alien has sustained the alien's
> burden of proof, and shall make credibility
> determinations, in the manner described in
> clauses (ii) and (iii) of section 1158(b)(1)(B)
> of this title.[14]

Congress's decision to adopt the "one central reason" standard for asylum but not withholding of removal claims appears to have been the product of a deliberate choice, rather than a mere drafting oversight. When Congress amended the withholding of removal statute to clarify the applicable burden of proof, it cross-referenced clauses (ii) and (iii) of the asylum statute's burden-of-proof provision, but not clause (i).[15] Clause (i) is the provision that imposed the "one central reason" standard for asylum claims. Congress's express incorporation of two of the three asylum burden-of-proof provisions into the withholding of removal statute, but not the provision including the "one central reason" language, indicates that Congress did not intend for the "one central reason" standard to apply to withholding of removal claims. *See Kucana v. Holder*, 558 U.S. 233, 249 (2010) ("Where Congress includes particular language in one section of a

---

[14] 8 U.S.C. § 1231(b)(3)(C) (emphasis added). Clauses (ii) and (iii) discussed in the quote refer to the credibility rules for asylum applicants located directly after the subsection requiring "one central reason." 8 U.S.C. § 1158(b)(i)–(iii).

[15] 8 U.S.C. § 1231(b)(3)(C).

statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

The government argues that "one central reason" and "a reason" mean the same thing. Barajas-Romero argues that the different words used in each statute mean different things.[16] We agree with Barajas-Romero. The phrase "a reason" includes weaker motives than "one central reason."

A person may have "a reason" to do something that is not his "central" reason or even "one central reason." Ordinary English usage, and the ordinary canon of statutory construction reflecting "the same common-sense premise that when people say one thing, they do not mean something else" indicate that we should attribute some operative meaning to the congressional decision to use the phrase "at least one central reason" in one statute but not the other.[17] Sometimes omission of a phrase implies a negative pregnant, and sometimes it does not.[18] Considering how controversial the reason for persecution has been in the immigration law community, the express congressional narrowing of one statute but not the other to "one central reason" cannot reasonably be read so to narrow both.

---

[16] *Kucana*, 558 U.S. at 249 (2010).

[17] 2A Sutherland Statutory Construction § 47:23 (7th ed.).

[18] *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992).

The BIA in this case followed its own precedent in *Matter of C-T-L-*.[19]  *C-T-L-* held that the "one central reason" test for asylum applies to withholding, even though the withholding statute says merely "a reason."[20]  The BIA came to this conclusion because: (1) the withholding statute is silent on whether the "one central reason" standard applies, (2) the general intent of the REAL ID Act was to correct what Congress saw as an anomaly created by *Borja v. I.N.S.*[21] and *Briones v. I.N.S.*[22] in mixed motive cases, and (3) before the REAL ID Act the Immigration and Naturalization Service ("INS") applied the same standard to asylum and withholding.[23]  This analysis starts with a false premise that Congress was "silent."  It was not.  It explicitly said "at least one central reason" for asylum, and "a reason," an expressly different standard, for withholding.

The government argues that we should accept the BIA's view in *C-T-L-* because we assumed in *Zetino v. Holder*[24] that the "one central reason" standard applies to withholding as well as asylum claims.  *Zetino* does not so hold.  The alien in that case sought asylum and withholding, but submitted no evidence that the feared persecution had anything to do with

---

[19] *Matter of C-T-L-*, 25 I. & N. Dec. 341 (2010).

[20] *Id.* at 344.

[21] *Borja*, 175 F.3d 732.

[22] *Briones v. I.N.S.*, 175 F.3d 727 (9th Cir. 1999).

[23] *C-T-L-*, 25 I. & N. Dec. at 344–48.

[24] *Zetino v. Holder*, 622 F.3d 1007 (9th Cir. 2010).

actual or imputed political opinion.**25**  His evidence was that masked gunmen murdered his family members to steal his grandfather's land and that his home country, El Salvador, was infested with violent gangs.**26**  We drew no distinction between the "one central reason" phrase in the asylum statute and the "a reason" phrase in the withholding statute, because there was no nexus at all between the feared persecution and political opinion.**27**

We hold that "a reason" is a less demanding standard than "one central reason."  The statutory language is unambiguously different, with different meanings, so there is no ambiguity justifying deference to the administrative agency's contrary view.**28**  The different language should not be treated as though it means the same thing.**29**  The withholding statute differs from the asylum statute in various ways, not just this one, so there is no reason to assume that Congress meant for them to be the same in this respect.  The withholding statute requires applicants to prove that it is more likely than not they will be persecuted**30**, while the asylum

---

**25**  *Zetino*, 622 F.3d at 1015–16.

**26** *Id.* at 1010.

**27** *Id.* at 1016.

**28** *Cf. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

**29** *See Kucana*, 558 U.S. at 249.

**30** 8 C.F.R. § 208.16.

statute requires only a "well-founded fear" of persecution[31], so the lighter standard for the strength of the nexus is offset by the more demanding standard of proof in the withholding statute. Since in withholding the petitioner must show a probability, not just a well-founded fear, of persecution, Congress may have diluted the nexus requirement in order to afford more protection against mistaken deportations where a protected ground played into that likelihood.

That is not the end of the withholding issue, though. The government argues that the police kidnaped and tortured Barajas-Romero to extort money, so his voicing of a political opinion on the third day of his kidnaping and torture could not mean that the torture was because of or on account of his previously unknown and irrelevant (to the persecutors) anti-corruption opinion. The evidence, though, is not unambiguous. The torture became much worse after Barajas-Romero voiced his anti-corruption opinion. Because the BIA accepted the government's view under the wrong standard, we remand to the BIA to decide the case under the correct standard: "a reason" rather than "one central reason."

## B. Convention Against Torture.

Congress provided that "it shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there

---

[31] Under 8 U.S.C. § 1158(a), an applicant "is eligible for asylum if he is a 'refugee,' i.e., if he is unable or unwilling to return to his home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.' *Lim v. I.N.S.*, 224 F.3d 929, 934 (9th Cir. 2000) (quoting 8 U.S.C. § 1101(a)(42)(A)).

are substantial grounds for believing that the person would be in danger of being subjected to torture."[32]  It directed that the appropriate agencies should adopt regulations to implement the provisions of the Convention Against Torture ("CAT").[33]  The implementing regulations are at 8 C.F.R. §§ 208.16–.18.

For CAT relief, the alien must prove that it is "more likely than not that he or she would be tortured if removed to the proposed country."[34]  The torturers' motivations need not relate to the five protected classifications for asylum or withholding of removal, so Barajas-Romero can establish entitlement to relief under CAT even if he cannot establish motivation related to his political opinion.[35]  What matters is the probability of future torture, which under circuit law

---

[32] Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub.L. No. 105–277, Div. G, Title XXII, § 2242, 112 Stat. 2681–822 (1998) (codified as a note to 8 U.S.C. § 1231 (1999)).

[33] *Id.:*

> (b) Regulations. - Not later than 120 days after the date of enactment of this Act [Oct. 21, 1998], the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.

[34] 8 C.F.R. § 208.16(c)(2).

[35] The five protected classifications for asylum are "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(42); 8 U.S.C. § 1231(3)(A).

includes killing,**[36]** carried out or knowingly acquiesced in by a public official.**[37]** All evidence relevant to the probability of future torture must be considered, including past torture and country conditions.**[38]**

Neither the BIA, the Immigration Judge, nor the government's brief, puts at issue whether Barajas-Romero's ordeal amounted to torture. The issue is that to be entitled to CAT relief, the torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."**[39]**

---

[36] *Cole v. Holder*, 659 F.3d 762, 771 (9th Cir. 2011).

[37] *Id*.

[38] 8 C.F.R. § 208.16:

> (3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:
>
> (i) Evidence of past torture inflicted upon the applicant;
>
> (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
>
> (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
>
> (iv) Other relevant information regarding conditions in the country of removal.

[39] 8 C.F.R. § 208.18(a)(1).

"Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity."[40]

The BIA rejected Barajas-Romero's claim on the grounds that the police who tortured him were "rogue officials" and he had not proved that he could not avoid the threat by relocating. Here is the entire portion of the opinion explaining rejection of the claim:

> We find no clear error in the Immigration Judge's finding that there are insufficient facts in this case to support the legal determination that Mexican officials, acting under "color of law," will more likely than not torture the applicant (or acquiesce in his torture) if he returns to Mexico. The facts here are simply inadequate to show such pervasive corruption that any particular officer's actions or acquiescence would not be that of a rogue official (I.J. at 6–7). As noted by the Immigration Judge, the Mexican government's laws and enforcement policies make it clear that the country is aggressively targeting corrupt government elements. The Immigration Judge also observed that the respondent could relocate out of the area where the 2006 attack occurred (I.J. at 7). Accordingly, the applicant has not met his burden of demonstrating eligibility for protection under the CAT.

---

[40] 8 C.F.R. § 208.18(a)(7).

The portions of the Immigration Judge's opinion to which the BIA refers say, regarding the "rogue official" issue, that although drug cartel violence and police corruption do exist in Mexico, the national government aggressively seeks to eliminate them:

> Here there is evidence in the country report of both drug cartel violence and police corruption. As mentioned, police corruption has been identified and targeted by Mexican authorities. There are laws on the books and verifiable efforts to root out corruption in government. Still, rogue elements do operate; however, the Mexican government's laws and enforcement policies make it clear the country is aggressive against such groups. The evidence does not establish that it is more likely than not if the Respondent was returned to Mexico he would suffer torture at the hands of the government or persons acting in an official capacity or aiding or acquiescing in his torture by others. *Wakkarv v. Holder*, 558 F.3d 1049 (9th Cir. 2009).

Regarding relocation, the Immigration Judge says that both California and Mexico have dangerous communities, and Barajas-Romero could relocate to "any region where he feels safe" and that is "populated by individuals, businesses, and employers acceptable to his standards":

> Respondent has painted the entire country of Mexico as a potential threat to him from a 2006 incident. The Court is not persuaded that is the case. Respondent has the ability to

> locate in any region where he feels safe or where he has access to authorities should he be threatened or attacked. Whether in California or Mexico, each region has communities that are both dangerous and secure. The key for Respondent would be to locate in an area populated by individuals, businesses and employers acceptable to his standards.

The statute and regulations do not establish a "rogue official" exception to CAT relief. The regulations say that torture, for purposes of relief, has to be "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."[41] The four policemen were "public officials," even though they were local police and state or federal authorities might not similarly acquiesce.[42] Since the officers were apparently off-duty when they tortured Barajas-Romero, they were evidently not acting "in an official capacity," but the regulation does not require that the public official be carrying out his official duties, so long as he is the actor or knowingly acquiesces in the acts. The regulation uses the word "or" between the phrases "inflicted by . . . a public official" and "acting in an official capacity." The word "or" can only mean that either one suffices, so the torture need not be both by a public official and also that the official is acting in his official capacity. An "and" construction would require that the conjunction be "and." The record leaves no room for doubt

---

[41] 8 C.F.R. § 208.18(a)(1).

[42] *Madrigal v. Holder*, 716 F.3d 499, 510 (9th Cir. 2013).

that the four policemen were public officials who themselves inflicted the torture.

CAT relief is forward-looking, requiring the applicant prove that it is more likely than not that he would be tortured if he were removed to the proposed country, not that he was tortured in the past. The alien must prove not only that torture will more likely than not occur, but also that there is sufficient state action involved in the torture.[43] Public officials acquiesce in torture if they: "(1) have awareness of the activity (or consciously close their eyes to the fact it is going on); and (2) breach their legal responsibility to intervene to prevent the activity because they are unable or unwilling to oppose it."[44] CAT relief is unavailable, despite a likelihood of torture, without evidence that the police are unwilling or unable to oppose the crime, not just that they are unable to solve it, as when the torturers cannot be identified.[45] Police ineffectiveness is not enough to establish an entitlement to relief, "absent evidence of corruption or other inability or unwillingness to oppose criminal organizations."[46] State involvement may be established, though, where "police officials were corrupt, and worked on behalf of criminals or gangsters."[47]

---

[43] *Garcia-Milian v. Holder*, 755 F.3d 1026, 1033 (9th Cir. 2014).

[44] *Id*. at 1034.

[45] *Id*.

[46] *Id*.

[47] *Id*. at 1035.

The BIA's "rogue official" rationale is inconsistent with circuit law. The BIA held that the danger Barajas-Romero faced from the drug cartel and corrupt police did not establish government involvement because Mexican law, and national policy to root out the corruption, established the absence of official acquiescence. But we held in *Madrigal v. Holder* that "if public officials at the state and local level in Mexico would acquiesce in any torture [petitioner] is likely to suffer, this satisfies CAT's requirement that a public official acquiesce in the torture, even if the federal government in Mexico would not similarly acquiesce."[48] The four police who tortured Barajas-Romero and told him he would be killed if he returned to Mexico were themselves government officials. As we held in *Madrigal*, the "efficacy of the government's efforts to stop the drug cartels' violence," not just the willingness of the national government to do so, must be examined.[49] Here, the BIA focused only on the national government's efforts and not their efficacy, which was mistaken under *Madrigal*.[50]

The other part of the BIA's rationale was that Barajas-Romero could relocate "to any region where he feels safe or has access to the authorities" in some "area populated by individuals, businesses and employers acceptable to his standards." The BIA did not articulate what standard of proof it applied when considering relocation, nor why it rejected Barajas-Romero's evidence to the contrary. The policemen had marked his forehead with a permanent scar to make him

---

[48] *Madrigal*, 716 F.3d at 510.

[49] *Id*. at 509

[50] *Id*.

recognizable, and they told him that "that is where the bullet would be" if he was seen anywhere in Mexico or if he reported the incident, which he did.  The State Department Human Rights Report on Mexico, while recognizing the national government's efforts to eliminate corruption and police entanglement with drug cartels, said that "corruption remained a problem at all levels of government," and some "public officials continued to perpetrate . . . some criminal acts with impunity."   The State Department cited with approval reports that "police, especially at the state and local level, were involved in kidnapping, extortion, and in providing protection for, or acting directly on behalf of, organized crime and drug traffickers." The State Department mentioned a member of Mexico's national congress, at large as a fugitive, who according to prosecutors was in charge of providing institutional protection to La Familia, the drug cartel who, along with the police, acted against Barajas-Romero.

We recently held in *Maldonado v. Lynch* that, although a petitioner bears the ultimate burden to prove he would be tortured if returned to his country, the petitioner does not bear the burden under 8 C.F.R. § 1208.16(c)(3) to show that it is impossible to avoid torture by internally relocating within a country.[51]  In doing so en banc, we overruled our earlier line of authority which had established that the petitioner bore the burden of proving that he would be unable to live safely elsewhere in the country.  We held that "[t]he regulations governing CAT deferral, unlike the asylum regulation, do not

---

[51] *Maldonado v. Lynch*, 786 F.3d 1155, 1163 (9th Cir. 2015) (*en banc*).

call for any burden shifting."[52]  The regulation, rather than imposing a burden of proof, says that all evidence bearing on the likelihood of future torture should be "considered," including but not limited to past torture, possibility of safe relocation, country evidence of flagrant human rights violations, and other evidence regarding country conditions.[53]

The BIA ruled in this case before *Maldonado* came down, so it doubtless applied what was then the applicable law, that Barajas-Romero had the burden of proving that he could not safely relocate.  The State Department country report says that the national government in Mexico is trying to eliminate widespread police corruption and police cooperation with drug cartels, but it is very much an ongoing effort rather than

---

[52] *Id*.

[53] 8 C.F.R. § 1208.16:

> (3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:
>
> (i) Evidence of past torture inflicted upon the applicant;
>
> (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
>
> (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
>
> (iv) Other relevant information regarding conditions in the country of removal.

a completed reform.     Past evidence of torture is uncontradicted and substantial.  There was not much evidence presented on relocation beyond Barajas-Romero's testimony that the police who tortured him told him that if he returned to Mexico, not just the village of Santa Clara, a bullet would go where they had scarred his forehead, and the State Department country report, which does not identify a safe place for individuals who have become targets of drug cartels and the police.

Because the BIA did not evaluate relocation under the no-burden-shifting standard, and applied the incorrect standard in assessing Barajas-Romero's withholding claim, we remand pursuant to *INS v. Ventura*[54] so that the BIA may conduct such proceedings as may be appropriate to evaluate the factors for CAT relief under the standard we set out in *Maldonado* and review Barajas-Romero's withholding claim under the proper legal standard of "a reason."

**PETITION GRANTED.**

---

[54] *I.N.S. v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam).