**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GERSON EDUARDO ALFARO MANZANO, | Nos. 22-704 |
| | 22-1521 |
| *Petitioner*, | Agency No. A205-479-889 |
| v. | |
| MERRICK B. GARLAND, Attorney General, | OPINION |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 2, 2024
Portland, Oregon

Filed June 25, 2024

Before: John B. Owens and Michelle T. Friedland, Circuit
Judges, and William Horsley Orrick, District Judge.[*]

Opinion by Judge Orrick

---

[*] The Honorable William Horsley Orrick, United States District Judge
for the Northern District of California, sitting by designation.

## SUMMARY[**]

### Immigration

Granting Gerson Eduardo Alfaro Manzano's petition for review of the Board of Immigration Appeals' decision, and remanding, the panel held that the record compelled the conclusion that Alfaro Manzano's Jehovah's Witness faith would be "one central reason" for his persecution in El Salvador.

An immigration judge granted withholding of removal but denied asylum, finding that Alfaro Manzano's religion would be "a reason" for his persecution but not "one central reason" sufficient for asylum eligibility. Clarifying the standard, the panel held that the record compelled the conclusion that Alfaro Manzano's faith would be "one central reason" for his persecution, where even in the absence of a gang's desire to extort him, Alfaro Manzano's religion, standing alone, would lead the persecutors to harm him. The panel remanded for the Attorney General to exercise his discretion in determining whether to grant Alfaro Manzano asylum.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jordan E. Cunnings (argued), Innovation Law Lab, Portland, Oregon; Stephen W. Manning, Immigrant Law Group PC, Portland, Oregon; for Petitioner.

Sarah K. Pergolizzi (argued), Trial Attorney; Holly M. Smith, Assistant Director; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C.; for Respondent.

**OPINION**

ORRICK, District Judge:

Petitioner Gerson Eduardo Alfaro Manzano, a native and citizen of El Salvador, preached to the youth of his hometown to convince them to embrace religion instead of joining gangs. The gangs did not like this. They attacked him, threatened him, and even tried to kill him. Alfaro Manzano fled to the United States. An immigration judge ("IJ") granted withholding of removal but denied asylum, finding that Alfaro Manzano's religion was "a reason" for his persecution but not "one central reason" sufficient for asylum eligibility. The Board of Immigration Appeals ("BIA") affirmed. We believe the record compels the contrary conclusion that Alfaro Manzano's faith was "one central reason" for his persecution. We accordingly grant the petition and remand for further proceedings.

# I. BACKGROUND

## A. Factual Background

Alfaro Manzano first came to the United States in 2003 and stayed for about eight years. During his time in the U.S., he became a Jehovah's Witness and was baptized in 2008. He joined the organization to find meaning in life. He regularly preached in the streets and went door to door talking to people about his beliefs. He explained that preaching "is my life" and it is what he "must do" as a Jehovah's Witness.

Alfaro Manzano voluntarily returned to El Salvador in November 2011. There, he joined a Jehovah's Witnesses congregation and continued preaching in the streets. He attended meetings on Wednesdays and Sundays and preached in the streets every weekend. He preached in poor neighborhoods, where there was violence and "criminality," because he believed those neighborhoods "need[ed] to hear about the Word of Jehovah." Although he preached to everyone he met, including gang members, Alfaro Manzano especially loved preaching to young people. His goal was to show the youth that they could choose peace and religion instead of joining a gang.

Alfaro Manzano felt spiritually secure while preaching, but he felt "[p]hysically[] unsure . . . [b]ecause of the violence and the criminality." Gang members "react[ed] violently" to his preaching, including by kicking him, cursing and calling him names, and throwing his papers. "[T]hey told me to go to shit, that I was a testicle of Jehovah."

In early April 2012, two members of the 18th Street Gang, or Barrio 18, approached Alfaro Manzano as he left

his car after work. They told him "they knew that I was a Jehovah's Witness and that they did not want to see me preaching anymore—that if I continued doing it, I would have to live up to the consequences." He understood this as a threat to kill him. They also demanded money and gave him a timeline for payment. When he responded that he would not stop because "preaching was my life," the gang members again told him that he would have to live with the consequences. "[T]hey made it very clear that they did not want me to preach at all."

Within weeks, the same two gang members approached him a second time. "[T]he first thing they said to me was that they had forbidden me to continue preaching and that I had continued to do it." One man raised his shirt and showed Alfaro Manzano his gun, telling him that he would "have to pay the consequences because I had not obeyed what they had asked me to do." The gang members eventually left without physically harming Alfaro Manzano.

Weeks later, the same men tried to run Alfaro Manzano's car off the highway. While Alfaro Manzano was with his wife on his way to visit family, he noticed a truck following closely behind him. The truck pulled alongside Alfaro Manzano's car, and when he turned, he saw that it was the same two gang members. The gang members tried to push him off the road, "so that [he] would crash into a tree or something." Alfaro Manzano managed to get away, but he and his wife were "very scared" realizing that "what was going on was very serious" and that the gang members "were going to kill [him]."

Alfaro Manzano and his wife fled to another part of El Salvador to live with his mother. He began preaching in that area, but the gang started calling his mother and demanding

money, threatening to kill the family if she did not pay. Fearing for his life, Alfaro Manzano fled to the United States. The threatening calls to his mother stopped when he left for the U.S. in June 2012.

At the IJ hearing, an expert witness explained that Salvadoran gangs view churches as a threat to their authority and power. Church members have been attacked, kidnapped, and murdered, especially those who preached in the streets. The expert testified that Jehovah's Witnesses are particularly visible to gangs because they dress distinctively and preach in public regularly. Alfaro Manzano, for example, wore a business suit and tie while preaching every weekend. The expert also testified that Barrio 18 seeks to control individuals and businesses in that part of El Salvador through extortion and violence, and that this is a problem throughout the country. The gang uses extortion to support itself financially and demonstrate loyalty.

Alfaro Manzano testified that he was afraid to return to El Salvador because his life revolves around his religion and preaching, and he believes he will be killed by the gangs for these activities.

**B. Procedural Background**

In 2018, Alfaro Manzano appeared with counsel before an IJ and testified in support of his applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The IJ found Alfaro Manzano credible, granted his application for withholding of removal, denied his application for asylum, and did not address his application for relief under CAT.

The IJ found that Alfaro Manzano's interactions with the gang did not rise to the level of past persecution but that he

established a clear probability of future persecution.  The IJ found that the Salvadoran government would be unwilling or unable to prevent the persecution, and that Alfaro Manzano could not evade harm by relocating.

The IJ determined, however, that although religion would be "a reason" for Alfaro Manzano's persecution sufficient to support withholding of removal, he did not meet the higher nexus standard required for asylum, which demands that a protected ground be "one *central* reason" for the harm.  The IJ reasoned that the record showed that "nearly all residents" were subject to extortion, and thus Alfaro Manzano "would likely be targeted . . . regardless of his religion."  The IJ further found that the gang members were primarily motivated by their desire to extort him, and that any motivation related to religion was "incidental to that primary goal."

The BIA affirmed the IJ and dismissed the appeal.  The BIA concluded that the IJ did not clearly err in finding that the gang's desire to increase its own wealth and power was the primary reason for targeting Alfaro Manzano, while religion "provided only an incidental or subordinate reason," and that he would have been targeted "irrespective of his religious practice."

## II. STANDARD OF REVIEW

We have jurisdiction under 8 U.S.C. § 1252(a).  "Where the BIA conducts its own review of the evidence and law, rather than adopting the IJ's decision, our review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted." *Flores Molina v. Garland*, 37 F.4th 626, 632 (9th Cir. 2022) (citation omitted).  Where, as here, the BIA dismissed an appeal, agreed with several of the IJ's findings, and added its own reasoning, "we review the

decisions of both the BIA and the [IJ] to the extent that the BIA agreed with the [IJ's] conclusions." *Id.*

"We review factual findings for substantial evidence and legal questions de novo." *Id.* (citation omitted). Under the substantial evidence standard, factual findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)).

## III. DISCUSSION

Alfaro Manzano challenges the agency's conclusion that he is not eligible for asylum because he was not targeted "on account of" any protected ground, arguing that the record compels the conclusion that religion is "one central reason" for his feared harm. We agree.

### A. The "At Least One Central Reason" Standard

"To qualify for asylum," Alfaro Manzano "must show that []he is a refugee within the meaning of 8 U.S.C. § 1101(a)(42)." *Kaur v. Garland*, 2 F.4th 823, 833 (9th Cir. 2021) (citing 8 U.S.C. § 1158(b)(1)). To do so, he must establish "that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for" his persecution. 8 U.S.C. § 1158(b)(1)(B)(i). We have defined a "central reason" as "a reason of primary importance to the persecutors, one that is essential to their decision to act." *Rodriguez Tornes v. Garland*, 993 F.3d 743, 751 (9th Cir. 2021) (quoting *Parussimova v. Mukasey*, 555 F.3d 734, 741 (9th Cir. 2009), *as amended*).

Properly assessing whether an asylum applicant has met this standard "is not simple because of the possibility of mixed motives: 'People, including persecutors, often have

mixed motives.'"  *Garcia v. Wilkinson*, 988 F.3d 1136, 1143 (9th Cir. 2021) (quoting *Barajas-Romero v. Lynch*, 846 F.3d 351, 357 (9th Cir. 2017)).  When there are mixed motives, "[a] central reason must be primary, essential, or principal." *Kaur*, 2 F.4th at 835.  The protected ground cannot play a "minor role"—"[t]hat is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm."  *Id.* (quoting *Parussimova*, 555 F.3d at 741).  But a motive may be a central reason even if "the protected ground was [not] the *only* reason for persecution."  *Garcia*, 988 F.3d at 1143–44 (citing *Parussimova*, 555 F.3d at 742).  Indeed, "[t]hat an unprotected ground . . . *also* constitutes a central reason for persecution does *not* bar asylum."  *Rodriguez Tornes*, 993 F.3d at 751 (citing *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1073 (9th Cir. 2017) (en banc)).

As a subset of these mixed-motive cases, we have explicitly recognized the viability of an "extortion-plus" claim.  A petitioner who has been the victim of extortion may satisfy the nexus requirement if "the petitioner was independently targeted, not just for money, but also *because of* a protected ground."  *Rodriguez-Zuniga v. Garland*, 69 F.4th 1012, 1020 (9th Cir. 2023) (citing *Ayala v. Sessions*, 855 F.3d 1012, 1021 (9th Cir. 2017)).  "[A] persecutor who extorts someone could in theory be motivated not just by the prospect of obtaining money but also by a petitioner's protected characteristic."  *Id.* at 1021.

We have acknowledged at least two ways to demonstrate the causal link required to meet the "one central reason" standard in a mixed-motives case.  First, "a motive is a 'central reason' if the persecutor would not have harmed the applicant if such motive did not exist" and the motive was more than "incidental" or "tangential."  *Rodriguez Tornes*, 993 F.3d at 751 (quoting *Parussimova*, 555 F.3d at 741).

Such a motive would be a but-for cause.  *See But-for Cause*, Black's Law Dictionary (11th ed. 2019) ("The cause without which the event could not have occurred.").   Second, "a motive is a 'central reason' if that motive, standing alone, would have led the persecutor to harm the applicant." *Rodriguez Tornes*, 993 F.3d at 751 (quoting *Parussimova*, 555 F.3d at 741).  In other words, a motive that is sufficient to cause the harm meets the standard.  "[P]ersecution may be caused by more than one central reason, and an asylum applicant need not prove which reason was dominant." *Parussimova*, 555 F.3d at 741.

The agency here concluded that Alfaro Manzano's asylum claim failed because he had not established that religion would be "one central reason" for persecution.  The agency explained that Alfaro Manzano would have been targeted "irrespective of his religious practice" because he was also targeted for extortion.  This statement implies that the agency believed "but-for" cause is *required* to satisfy the "one central reason" standard.  The Government defends this reasoning by relying on language in one of our prior opinions that, if taken out of context, could be read to suggest that but-for cause is always necessary to meet the "one central reason" standard.  In *Rodriguez Tornes*, 993 F.3d at 751, we quoted a passage from the Attorney General's opinion in *Matter of A-B-*, 28 I. & N. Dec. 199, 208 (A.G. 2021), stating that "[t]o establish the necessary nexus, the protected ground: (1) must be a but-for cause of the wrongdoer's act; and (2) must play more than a minor role."[1]  Although we

---

[1] That Attorney General opinion was vacated in its entirety two months after we published *Rodriguez Tornes*, in part because the opinion "attempted to clarify . . . the meaning of the statutory 'one central reason' test . . . without the benefit of additional briefing or other public input." *Matter of A-B-*, 28 I. & N. Dec. 307, 309 (A.G. 2021).

said in *Rodriguez Tornes* that the test from *Matter of A-B-* was "indistinguishable from our own," it is clear from the context that we were simply addressing the test applicable to *one* way of meeting the nexus standard in a mixed-motive asylum case. *Rodriguez Tornes*, 993 F.3d at 751. In that passage, we explained simply that our caselaw had already held that a protected ground that is a but-for cause of persecution must also play more than a "minor role" in the persecutor's decision to satisfy the "one central reason" standard. *Id.*[2] We made clear elsewhere in the opinion that a *second* way to satisfy the "one central reason" requirement is to show that a "motive, standing alone, would have led the persecutor to harm the applicant." *Id.* (quoting *Parussimova*, 555 F.3d at 741). These two potential ways to show a sufficient causal nexus to a protected ground are not the same.

To understand the difference between these ways of meeting the "one central reason" standard, it may be helpful to imagine a bucket filling with water. The water represents a potential persecutor's motivation to harm someone, and when the bucket overflows, he acts. First, imagine the bucket is filled to the brim with water. A drop of water is added, and the bucket overflows. That additional drop is technically a but-for cause of the overflow because the bucket would not have overflowed without it, but we would likely call the drop "incidental." Analogously, a potential

---

[2] We made that statement in rejecting the Government's argument that *Matter of A-B-* had changed the nexus requirements and thus required remand. *Rodriguez Tornes*, 993 F.3d at 751. This correctly reflected that the passage in question from *Matter of A-B-* was quoting *Matter of L-E-A-*, 27 I. & N. Dec. 40, 43-44 (BIA 2017), which in turn was citing *Matter of N-M-*, 25 I. & N. Dec. 526, 531 (BIA 2011), which itself relied on our court's opinion in *Parussimova* for this but-for cause concept.

persecutor could hate dog-owners and have mild irritation toward Christians. Although the hatred for dog-owners isn't quite enough to cause him to engage in violence (so is not quite enough to make the bucket overflow), when he learns that a dog-owner is also a Christian, that irritation tips him over the line. The nexus standard requires something more than that "minor" addition, so being a Christian would not be a "central reason" for that violence even though it was a but-for cause. The two-step inquiry articulated in *Rodriguez Tornes*, then, is meant to ensure that the protected ground wasn't just a "drop in the bucket." Importantly, though, an applicant is not required to show "that such reason accounts for 51% of the persecutors' motivation." *Parussimova*, 555 F.3d at 740; *see also id*. at 741 ("[A]n asylum applicant need not prove which reason was dominant."); *Garcia*, 988 F.3d at 1144 (reversing because the agency failed to account for how the protected ground played an "important role" in the harm).

Next, imagine that the potential persecutor hates Christians so much that this motivation represents enough water on its own to overflow the bucket. This would meet the "standing alone" inquiry we described in *Parussimova* because putting other motivations aside, the hatred toward Christians is sufficient to cause the harm. Importantly, though, a protected ground could meet the "standing alone" inquiry and *not* be a but-for cause of the harm. Imagine that the potential persecutor hates dog-owners and also hates Christians enough that either reason on its own would be sufficient to cause him to act—*either* motive represents enough water on its own to overflow the bucket. In that circumstance, *neither* motive is a but-for cause of the harm, because the harm would happen even in the absence of the other trait. It is a well-known phenomenon that where "two

or more events or conditions each would have been sufficient to produce an injurious result . . . none of the events or conditions alone will emerge" as a but-for cause. *Overdetermined Causation*, Black's Law Dictionary (11th ed. 2019). Under *Parussimova*, as directly quoted in *Rodriguez Tornes*, however, both being a dog-owner and being a Christian would be considered central reasons because each, "standing alone, would have led the persecutor to harm the applicant." 993 F.3d at 751 (quoting *Parussimova*, 555 F.3d at 741). Under the "standing alone" inquiry, we simply ask whether the motive arising from a protected ground was sufficient on its own to cause the harm, and the inquiry ends there. No further analysis of the unprotected grounds is necessary.

In sum, both of these routes to meeting the "one central reason" standard are available to asylum applicants. Sometimes, a protected ground will be a but-for cause of the harm and play more than a minor role, but it won't be sufficient on its own to cause the harm. Other times, a protected ground will be sufficient on its own, but it won't be a but-for cause because there is another unprotected ground that would be sufficient on its own. Under *Parussimova*, both circumstances meet our "one central reason" standard.

The Government's insistence on but-for cause would require us to ignore the "standing alone" inquiry from *Parussimova* that we repeated in *Rodriguez Tornes*. But we cannot ignore that inquiry, which cannot possibly be dicta because it was specifically added to *Parussimova* in connection with our denial of a petition for rehearing en banc. 555 F.3d at 736 (noting that the opinion would be amended to insert "Likewise, a motive is a 'central reason' if that motive, standing alone, would have led the persecutor

to harm the applicant"). Nothing in *Rodriguez Tornes* purported to disturb the "one central reason" test as articulated in *Parussimova*—rather, *Rodriguez Tornes* quoted *Parussimova* at length. *See Rodriguez Tornes*, 993 F.3d at 751.

## B. The Record Compels the Conclusion that Religion Would be a Central Reason for Alfaro Manzano's Persecution

Applying these principles to the facts of this case, we hold that the record compels the conclusion that religion would be "one central reason" for any future harm to Alfaro Manzano. This holding is not precluded by the evidence supporting the conclusion that the gang's threats to Alfaro Manzano were also motivated by financial gain, because under our precedent there can be more than one reason for the persecution—even more than one *central* reason.

Even in the absence of the gang's desire to extort him, Alfaro Manzano's religion, "standing alone, would . . . [lead] the persecutor[s] to harm [him]." *Parussimova*, 555 F.3d at 741. An asylum applicant's testimony about a persecutor's statement can be enough to establish motive, even if other motives exist. *See Rodriguez Tornes*, 993 F.3d at 753; *Bringas-Rodriguez*, 850 F.3d at 1073; *see also Garcia*, 988 F.3d at 1144 (explaining that an applicant's testimony about a persecutor's motive can "be sufficient to establish nexus" for an asylum claim (citation omitted)). Alfaro Manzano credibly[3] testified that the gang members took issue with his preaching as a Jehovah's Witness and threatened to kill him

---

[3] The BIA did not disturb the IJ's finding that Alfaro Manzano is credible, so we view him as credible and must accept his testimony as true. *See Garcia*, 988 F.3d at 1143 (citing *Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004)).

if he did not stop.   When he did not obey them, they explicitly told him that his failure to obey would lead to consequences, and they followed through on their threats by trying to run him off the road.   There is evidence that even before those explicit threats, gang members had consistently reacted violently to his preaching, kicking him, calling him names such as "Jehovah's testicle," and throwing his papers. Each time gang members approached him, they *started* by demanding that he stop preaching or by threatening him for failing to stop.[4]   Although they also demanded money, the record compels the conclusion that the gang members were motivated to target Alfaro Manzano because of his religion. *See Rodriguez-Zuniga*, 69 F.4th at 1021 ("[A] persecutor who extorts someone could in theory be motivated not just by the prospect of obtaining money but also by a petitioner's protected characteristic.").

---

[4] The IJ concluded that this testimony was not enough to show that religion was a primary motivator of the attacks, finding that Alfaro Manzano did not disclose the persecutors' statements during his credible fear interview.   But that conclusion is not supported by the record because the interview notes show that Alfaro Manzano told the interviewer that the gang members insulted and kicked him when he preached, that they called him "Jehovah's testicles," that the same people who insulted him "because of [his] religion" were the ones threatening to extort money from him, and that they tried to run him off the road. Recognizing that Alfaro Manzano told the interviewer about being insulted and kicked while preaching, the IJ seemed to believe that Alfaro Manzano should have emphasized the role of his religion more strongly during the credible fear interview.   But the IJ failed to address Alfaro Manzano's explanation—which the IJ found credible— that he did not want to "stain . . . the name of Jehovah" by emphasizing that he was threatened because of his religion.   His credible fear interview was therefore consistent with his testimony before the IJ, providing further evidence of the role that religion played in the attacks.

In *Parussimova*, by contrast, there were three possible reasons for the asylum applicant's attack: her ethnicity, her association with an American company, and her vulnerability as a young woman walking alone. 555 F.3d at 741. Ethnicity was the only asserted protected ground. We denied the petition, holding that the record did not compel the conclusion that ethnicity was a "central motivating reason" for the attack. *Id.* at 742. We reasoned that it was not clear that ethnicity "caused the assailants to initiate their attack or increase its severity once it had begun." *Id.* Although the attackers at one point called the applicant a "Russian pig," "the assailants accosted [the applicant] and dragged her off the street without any mention of her ethnicity," and the first statement the assailants made once they had cornered her was a reference to the pin she was wearing that showed she worked for an American company. *Id.* Unlike in *Parussimova*, Alfaro Manzano's religious activities—during which he was highly visible because of his distinctive dress—caused the gang members to initiate their threats, and religion remained front and center during his encounters with them.

In addition to the gang members' statements, an expert testified that Salvadoran gangs target church members, and that church members have been attacked, kidnapped, and murdered, especially those who preached in the streets. The expert testified that Jehovah's Witnesses are particularly visible to gangs because they dress distinctively and preach in public regularly, just like Alfaro Manzano. This evidence further supports the conclusion that religion would be "one central reason" for future harm at the hands of gang members, even absent their desire for financial gain through extortion.

There is simply no reason on this record to think that religious activity would have been insufficient to cause the gang to target Alfaro Manzano.  If this is not an "extortion-plus" claim, it is unclear what would be.  Importantly, Alfaro Manzano's religion can be a "central reason" for persecution even if the gang's general desire to increase its power and wealth is also a central reason.  We have repeatedly acknowledged that a persecutor may have more than one central reason, so long as both are of primary importance.  *See Garcia*, 988 F.3d at 1143 (noting that persecutors "often have mixed motives" (citation omitted)); *cf. Barajas-Romero*, 846 F.3d at 359 (contrasting the lower "a reason" standard for withholding of removal and noting "[a] person may have 'a reason' to do something that is not his 'central' reason").  The record compels the conclusion that his religion would be "one central reason" for his persecution because "standing alone," Alfaro Manzano's religion would still motivate the gang members to target him.

Accordingly, the conclusion reached by the BIA and IJ is not supported by substantial evidence, and we are compelled to reach a contrary conclusion.[5]

## IV. CONCLUSION

In sum, we hold that the record compels the conclusion that Alfaro Manzano's religion would be a central reason for his persecution.  Because it is uncontested that Alfaro Manzano's religion constitutes a protected ground under the statute, and the agency necessarily recognized that he satisfied the other asylum criteria in granting withholding of

---

[5] Because we conclude that Alfaro Manzano is eligible for asylum based on the persecution he would face on account of his religion, we need not and do not reach his arguments that the BIA and IJ failed to address his other proffered protected grounds as bases for asylum.

removal, he is eligible for asylum. *See Garcia*, 988 F.3d at 1146 (explaining that the withholding of removal burden-of-proof standard is "more stringent" than the asylum standard). On remand, the Attorney General shall exercise his discretion in determining whether to grant Alfaro Manzano asylum. *See Parada v. Sessions*, 902 F.3d 901, 916 (9th Cir. 2018) (holding that petitioner was statutorily eligible for asylum and remanding for the Attorney General to exercise discretion as to whether to grant asylum).

If Alfaro Manzano does not receive asylum, he shall still receive withholding of removal, the grant of which the Government did not appeal. *See id.*

**PETITION     FOR     REVIEW     GRANTED; REMANDED.**