FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CANDELARIA DE LOS ANGELES
CORPENO-ROMERO; JAVI
ALEXANDER CORNEJO-
CORPENO,

  *Petitioners*,

 v.

MERRICK B. GARLAND, Attorney
General,

  *Respondent*.

No. 23-576

Agency Nos.
A215-944-680
A215-944-681

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted May 17, 2024
San Francisco, California

Filed October 22, 2024

Before: Sidney R. Thomas, Consuelo M. Callahan, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sanchez;
Partial Dissent and Partial Concurrence by Judge Callahan

# SUMMARY[*]

## Immigration

Granting in part and denying in part a petition for review of a decision of the Board of Immigration Appeals, and remanding, the panel held that petitioners Candelaria De Los Angeles Corpeno-Romero and her child Javi Alexander Cornejo-Corpeno both established that they suffered harm rising to the level of persecution and that such harm was on account of a protected ground.

The panel held that the record compelled the conclusion that members of the M-18 gang who murdered Javi's father Carlos were willing and capable of doing the same to Javi and Candelaria. Javi's persecution began soon after the men who had murdered his father were released from prison, when members of M-18 began following Javi from school to his home and threatening to kill him and Candelaria. The threat was not idle, as one of the men who threatened Javi's life was the same person who had been convicted of murdering his father, and Candelaria testified credibly that M-18 held a grudge against the family due to their perceived cooperation with the police after Carlos's murder. And days after M-18's death threat, armed men broke into Javi and Candelaria's home "looking for someone." The panel explained that a petitioner need not wait for the threat of violence to materialize where death threats are specific, menacing, and credible.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the agency erred by failing to assess whether M-18's death threat caused Javi significant actual suffering or harm. By not addressing uncontradicted evidence that Javi currently experiences post-traumatic stress disorder from having his life threatened by the men who murdered his father, the agency ignored the actual harm Javi continues to suffer from his experience.

The agency also erred by failing to consider Javi's experience from the perspective of his relatively young age. In light of the specific and menacing nature of M-18's death threat against Javi by men involved in the murder of his father, the violent near-confrontation at Javi and Candelaria's home by armed men soon thereafter, and the significant emotional trauma that Javi experienced as a fourteen-year-old and continues to endure, the record compelled a finding of past persecution.

The panel concluded that the agency also erred by treating M-18's two alleged motives—targeting Javi to increase the size of M-18 and targeting him because of his status as Carlos's son—as mutually exclusive, and in failing to acknowledge the possibility of mixed motives. The evidence compelled the conclusion that Javi's and Candelaria's relationship to Carlos was a reason of primary importance to the gang members and was essential to their decision to target and threaten them. Thus, petitioners met the "one central reason" nexus standard for asylum, as well as the weaker "a reason" standard for withholding of removal, based on their membership in a social group comprised of immediate family members of Carlos.

The panel remanded for the agency to determine whether the final element of the past persecution analysis—whether the persecution was committed by the government or by

forces that the government was unable or unwilling to control— was satisfied, and whether petitioners otherwise established a well-founded fear of future persecution.

Dissenting in part and concurring in part, Judge Callahan agreed that the BIA erred in concluding that there was an insufficient causal nexus between Javi's relationship to his father and being targeted by M-18, but she disagreed that the record compelled a finding that petitioners' past experiences were so extreme that they constituted persecution. First, the agency's failure to mention certain factors did not necessarily mean they failed to consider them. Additionally, the majority improperly diverted focus from the conduct of the perpetrator to petitioner's claimed subjective psychological harm. Moreover, the majority supplanted the BIA's substantially supported view of the facts with its own preferred version of the facts, thereby exceeding the "carefully circumscribed" bounds of this court's substantial evidence review of BIA decisions.

## COUNSEL

Sean P. Perdomo, I, (argued), Bay Area Immigration, San Francisco, California; Mario Salgado, Salgado & Associates PA, San Francisco, California; for Petitioner.

Zachary S. Hughbanks (argued), Trial Attorney; Timothy B. Stanton, Senior Trial Attorney; Sheri R. Glaser, Senior Litigation Counsel; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Civil Division/Office of Immigration Litigation, Washington, D.C.; for Respondent.

## OPINION

SANCHEZ, Circuit Judge:

Candelaria De Los Angeles Corpeno-Romero and her child Javi Alexander Cornejo-Corpeno ("Petitioners") seek review of a decision of the Board of Immigration Appeals ("BIA") ordering them removed to El Salvador. The BIA affirmed the immigration judge's ("IJ") denial of Petitioners' applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). We have jurisdiction under 8 U.S.C. § 1252. We grant the petition in part, deny the petition in part, and remand to the BIA for further proceedings consistent with this opinion.[1]

**I.**

Candelaria and her son Javi arrived in the United States in 2018. The Department of Homeland Security ("DHS") initiated removal proceedings against them in September of that year. Candelaria and Javi conceded removability and, in July 2019, filed applications for asylum, withholding of removal, and CAT protection.

At the removal hearing, Candelaria and Javi presented evidence about their experience in El Salvador before coming to the United States. The evidence in the record consists of the testimony of Candelaria, Javi, and licensed clinical social workers who provided expert testimony about

---

[1] In this opinion, we address the agency's determination of no past persecution and its application of the nexus standard with regard to Petitioners' asylum and withholding of removal claims. We address Petitioners' other arguments and claims in an unpublished memorandum disposition filed concurrently with this opinion.

Javi's current psychological condition.  We summarize the evidence in the record and the agency's decisions below.**[2]**

## A.

We begin with the testimony of Candelaria, which went uncontested by DHS and was accorded "full evidentiary weight" by the IJ.  Because the agency found Candelaria credible, her "statements must be taken as true" for purposes of this appeal.  *Kaur v. Wilkinson*, 986 F.3d 1216, 1221 (9th Cir. 2021) (quoting *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1171 (9th Cir. 2006)).  Candelaria testified that she had three children in El Salvador—including Javi—with a man named Carlos Rodolfo Cornejo-Montano.  Carlos was married to another woman and lived two hours away but was involved in Candelaria's children's lives.

In August 2010, Javi's father Carlos was shot and killed by members of the M-18 gang after he stopped making extortion payments.  Carlos's sister asked Candelaria to go with her to the police station to identify the men whom police had detained on suspicion of killing Carlos.  At the station, police identified two men through one-way glass as members of M-18.  Candelaria noticed that one of the men was tall, thin, bearded, and had a large "18" tattooed on the

---

[2] The agency referred to Candelaria as the "lead respondent" and noted that Javi was named as a derivative beneficiary on her asylum application and also filed a separate Form I-589 on his own behalf.  "When confronting cases involving persecution of multiple family members, we have not formalistically divided the claims between 'principal' and 'derivative' applicants but instead, without discussion, have simply viewed the family as a whole."  *Tchoukhrova v. Gonzales*, 404 F.3d 1181, 1192 (9th Cir. 2005) (collecting cases), *cert. granted*, *judgment vacated on other grounds*, 549 U.S. 801 (2006).  Consistent with this "pragmatic" approach, the agency analyzed Candelaria's and Javi's claims together.  We follow the same approach here.

left side of his neck.  Carlos's sister later told Candelaria that M-18 members had demanded that Carlos's family withdraw any report made to the police about Carlos's murder.  The gang threatened to kill Carlos's family for cooperating with the police, which forced the family to flee their hometown. The two men were convicted and sentenced to long prison terms.

In July 2018, the men convicted of murdering Carlos were released from prison.  Around the same time, M-18 gang members began to harass Javi, who was then fourteen years old.  On three separate occasions, M-18 gang members followed Javi as he left school and rode the bus home.  The men would stay on the bus until Javi got off at his stop and then disappear.

On the third occasion, M-18 gang members surrounded Javi and grabbed him while waiting for the bus.  The men demanded that Javi join their gang or else they would kill him, Candelaria, and his family.  Candelaria testified that the men threatened Javi and his family and "told him that they had already investigated and found out that he was the son of [Chicharron]," Carlos's nickname.  According to Candelaria, the men told Javi that they "knew everything about him" and called Javi the "faggot son" of Carlos.  Javi managed to free himself and run to the safety of other people. When Javi arrived home, he was "frightened," "terrorized," and crying, and he begged Candelaria not to send him to school anymore.

Several days later, while Candelaria was selling food from her street cart with Javi, two men walked by and stared at them.  Javi told Candelaria that these were the same men who had followed him after school and confronted him. Candelaria immediately recognized one of the men as the

gang member she had seen at the police station with a large "18" tattoo on the side of his neck—the same person who was later convicted of killing Carlos. Candelaria believed that M-18 held a "grudge" against Carlos's family—including Javi—because of the family's perceived cooperation with the police after Carlos's murder. She took Javi and fled five hours north to her sister's house.

Once there, Candelaria heard from a neighbor that armed men had broken into her home. The neighbor called Candelaria "to tell [her] that some men had entered [her] house, they were armed and they were looking for someone." At that point, Candelaria decided that Javi was no longer safe in El Salvador, and she fled north to the United States with him.

In support of Petitioners' applications for asylum, withholding of removal, and CAT protection, Javi submitted a declaration which the IJ found consistent with Candelaria's testimony. In the declaration, Javi stated that he was "not really sure" why the M-18 members targeted him, and he explained that he fled El Salvador with his mother because he "did not want to be murdered" like his father.

Petitioners also submitted a letter signed by two licensed clinical social workers that summarized a "comprehensive mental health evaluation" of Javi. The evaluation concluded that "Javi's experience of having his life threatened after losing his father has left a profound psychological impact" which "meets criteria for diagnosis of Post-Traumatic Stress Disorder (PTSD)." The evaluation stated that, since leaving El Salvador, "Javi has experienced regular nightmares and flashbacks involving the men who threatened him" and otherwise "exhibits significant post-trauma symptomology."

**B.**

An immigration judge resolved Petitioners' claims together in an oral decision dated August 1, 2019. The IJ analyzed Candelaria's testimony "for consistency, specificity, and persuasiveness" at the hearing, found that she testified "credibly," and accorded her testimony "full evidentiary weight." Similarly, both DHS and the IJ accepted Petitioners' offers of proof that Javi and the expert witnesses would testify consistently with their written statements, and DHS declined to cross-examine them. Candelaria and Javi claimed they were persecuted in El Salvador by the M-18 gang and fear further harm upon removal to El Salvador based upon their status as immediate family members of Carlos Rodolfo Cornejo-Montano, among other particular social groups.

The IJ denied Petitioners' asylum and withholding of removal claims on the ground that they did not establish past persecution or a well-founded fear of future persecution in El Salvador on account of a protected ground. The IJ concluded that the cumulative harm—which, in the IJ's view, amounted to "one incident of Javi being confronted by some alleged gang members where they did not physically harm him" as well as an unfulfilled threat—did not amount to past persecution. The IJ then held that Candelaria and Javi did not establish an objectively reasonable fear of future persecution because the harm they feared was one of "generalized violence" from "criminal elements," as opposed to harm on account of a statutorily protected ground.

The BIA dismissed Petitioners' appeal and affirmed the IJ's decision in an unpublished decision. The BIA upheld the denial of their claims for asylum and withholding of

removal on the ground that they failed to establish past persecution or the nexus requirement. The BIA agreed with the IJ that their experiences in El Salvador, even considered cumulatively, did not rise to the level of past persecution. As for nexus, the BIA assumed that the particular social group comprised of the "family of Carlos Rodolfo Cornejo-Montano" was cognizable but nevertheless concluded that Candelaria's and Javi's familial status was not "one central reason" or even "a reason" for their persecution. The BIA found that "the gang members' unsuccessful attempt to recruit [Javi] does not establish a motivation to punish him or [Candelaria] for their family membership but rather a desire to enlist a new gang member into their ranks." This petition for review followed.

## II.

Our review is limited to the BIA's decision, except to the extent it expressly adopts the IJ's opinion. *See Singh v. Garland*, 97 F.4th 597, 602 (9th Cir. 2024) (quoting *Soriano-Vino v. Holder*, 653 F.3d 1096, 1099 (9th Cir. 2011)). We review the agency's factual findings for substantial evidence and legal questions de novo. *See Guerra v. Barr*, 974 F.3d 909, 911 (9th Cir. 2020).

Where, as here, the BIA determines whether the petitioner's past harm rose to the level of persecution, we have held alternatively that the BIA's determination is reviewed de novo or for substantial evidence. *See, e.g.*, *Kaur*, 986 F.3d at 1221 (reviewing de novo); *Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2021) (reviewing for substantial evidence). We need not address which standard should apply because we conclude that the harm suffered by Javi and Candelaria rose to the level of persecution even under the substantial evidence standard, which affords

greater deference to the BIA's determinations.  *See Singh*, 97 F.4th at 603.

## A.

To qualify for asylum or withholding of removal based on a claim of past persecution, Candelaria and Javi must show that (1) their past treatment in El Salvador rose to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government or by forces that the government was unable or unwilling to control.  *See Flores Molina v. Garland*, 37 F.4th 626, 633 (9th Cir. 2022) (citations omitted).  At the first step, the agency concluded that Candelaria's and Javi's past experience in El Salvador did not rise to the level of persecution.  The agency's conclusion is unsupported by substantial evidence.

Persecution is an "extreme concept that means something considerably more than discrimination or harassment." *Sharma*, 9 F.4th at 1060 (quoting *Donchev v. Mukasey*, 553 F.3d 1206, 1213 (9th Cir. 2009)). "Determining whether the facts compel a conclusion of past persecution is ultimately a fact-bound endeavor that is not reducible to a set formula." *Id.* at 1061.  In each case, "the key question is whether, looking at the cumulative effect of all the incidents that a Petitioner has suffered, the treatment he received rises to the level of persecution." *Id.* (citation omitted).

Petitioners often point to threats made against them in support of their claims of past persecution, as Candelaria and Javi do here.  To be sure, "mere threats, without more, do not necessarily compel a finding of past persecution." *See id.* at 1062 (quoting *Villegas Sanchez v. Garland*, 990 F.3d 1173, 1179 (9th Cir. 2021)).  That is because "[t]hreats

themselves are sometimes hollow and, while uniformly unpleasant, often do not effect significant actual suffering or harm." *Hoxha v. Ashcroft*, 319 F.3d 1179, 1182 (9th Cir. 2003) (quoting *Lim v. I.N.S.*, 224 F.3d 929, 936 (9th Cir. 2000)).

But not all threats are hollow. We have long recognized that "*credible* death threats alone can constitute persecution." *Duran-Rodriguez v. Barr*, 918 F.3d 1025, 1028 (9th Cir. 2019) (cleaned up and emphasis added) (citing *Navas v. I.N.S.*, 217 F.3d 646, 658 (9th Cir. 2000)). "What matters in assessing the sufficiency of the threat to establish persecution is whether the group making the threat has the will or the ability to carry it out." *Aden v. Wilkinson*, 989 F.3d 1073, 1083 (9th Cir. 2021) (cleaned up and citation omitted). We have "repeatedly held that threats may be compelling evidence of past persecution, particularly when they are specific and menacing and are accompanied by evidence of violent confrontations, near-confrontations and vandalism." *Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004).

In analyzing the past persecution claim, the agency acknowledged that "death threats combined with instances of harm may constitute persecution when made by an individual or group capable of carrying out the threats." Nevertheless, the agency did not assess whether M-18 was, in fact, capable of carrying out its death threat against Petitioners. After reciting the underlying facts, the agency simply said: "Although reprehensible, the facts presented by the respondents, even when considered cumulatively, do not rise to the level of persecution."

We disagree. The record compels the conclusion that the men who murdered Javi's father were willing and capable of

doing the same to Javi and Candelaria. Javi's persecution began soon after the men who had murdered his father were released from prison. Members of M-18, a violent street gang, located and identified Javi and began to follow him from school to his home. These men "knew everything about" Javi and called him the "faggot son" of Carlos. They surrounded Javi and threatened to kill him and Candelaria. The threat was not idle; one of the men who threatened Javi's life was the same person who had been convicted of murdering his father. Candelaria testified credibly that M-18 held a "grudge" against Carlos's family, including Javi, because of the family's perceived cooperation with the police after Carlos's murder. And days after M-18's death threat, armed men broke into Javi and Candelaria's home "looking for someone."

Our caselaw does not require that a petitioner wait for the threat of violence to materialize before seeking the protections of asylum law. "Even if an applicant does not suffer physical violence, we have 'consistently held that death threats alone can constitute persecution.'" *Singh v. Garland*, 57 F.4th 643, 653 (9th Cir. 2023) (quoting *Canales-Vargas v. Gonzales*, 441 F.3d 739, 743–44 (9th Cir. 2006) (collecting cases)); *see also Flores Molina*, 37 F.4th at 634; *Kaur*, 986 F.3d at 1223, 1227 (reiterating that death threats "alone" can constitute persecution "because murder is perhaps the ultimate threat to bodily integrity"). Here, the death threat against Javi was specific, menacing, and credible. The fact that M-18 repeatedly stalked Javi and, days after threatening his life, broke into his home looking for someone while armed, shows that "the threat of harm— and possibly death—was imminent." *Knezevic v. Ashcroft*, 367 F.3d 1206, 1212 (9th Cir. 2004) (finding past persecution where petitioners fled their hometown because

they "realized the threat of harm—and possibly death—was imminent"); *see also Fon v. Garland*, 34 F.4th 810, 815 (9th Cir. 2022) ("[P]ersecutors showed that they had the will or the ability to carry out their death threat by visiting Petitioner's home and ransacking it.").

The agency also failed to assess whether M-18's death threat caused Javi significant actual suffering or harm. We have recognized that death threats alone may rise to the level of past persecution "when the threats are so menacing as to cause significant actual suffering or harm." *Duran-Rodriguez*, 918 F.3d at 1028 (citing *Lim*, 224 F.3d at 936). Here, two expert witnesses evaluated Javi and concluded that "Javi's experience of having his life threatened after losing his father has left a profound psychological impact," which "meets criteria for diagnosis of Post-Traumatic Stress Disorder (PTSD)." They wrote that, since leaving El Salvador, "Javi has experienced regular nightmares and flashbacks involving the men who threatened him" and otherwise "experiences post-trauma symptoms on a regular basis." The expert witnesses also documented other "intrusive symptoms" that, taken together, "make it hard for [Javi] to focus in school, interrupt his sleep, and make it hard to heal as he is regularly re-experiencing the trauma." In failing to address uncontradicted evidence that Javi currently experiences PTSD as a result of having his life threatened by the men who murdered his father, the agency ignored the actual harm Javi continues to suffer from his experience in El Salvador.

While the dissent suggests that this court breaks new ground by focusing on evidence of Javi's PTSD, our cases have long recognized that emotional and psychological harm may constitute evidence of past persecution. In *Mashiri*, 383 F.3d at 1120, we observed that

"[p]ersecution may be emotional or psychological, as well as physical," citing *Duarte de Guinac v. I.N.S.*, 179 F.3d 1156, 1163 (9th Cir. 1999) and *Kovac v. I.N.S.*, 407 F.2d 102, 105–07 (9th Cir. 1969).  The petitioner's testimony of the "constant fear and anxiety" she experienced from a death threat, near-confrontation with a violent mob, and other acts of vandalism was "compelling evidence of the emotional trauma she endured" and compelled a finding of past persecution.  *Id.* at 1120–21; *see also Khup v. Ashcroft*, 376 F.3d 898, 904 (9th Cir. 2004) (concluding the IJ failed to address whether "the arrest, torture, and killing of [a] fellow preacher, and the terror these acts would have aroused" compelled a finding of past persecution); *Mendoza-Pablo v. Holder*, 667 F.3d 1308, 1313–14 (9th Cir. 2012) (holding that the harms suffered by a child's family "must be considered in assessing whether the events of his childhood rise to the level of past persecution").  Because emotional trauma is a form of persecution, evidence in support of such claim may be adduced, as was here, through witness testimony of the traumatic events in question as well as expert testimony of its psychological after-effects.[3]

---

[3] The dissent's suggestion that evidence of emotional trauma is not probative of a claim of persecution rests on a misreading of *Antonio v. Garland*, 58 F.4th 1067 (9th Cir. 2023) and related cases.  Our prior caselaw has made clear that asylum applicants are not *required* to produce evidence of lasting physical or psychological injury.  *See Antonio*, 58 F.4th at 1074 ("'[W]e do not require severe injuries to meet the serious-harm prong of the past-persecution analysis.'" (quoting *Singh v. Garland*, 48 F.4th 1059, 1068 (9th Cir. 2022)); *Kaur*, 986 F.3d at 1225–26 ("The BIA committed legal error by requiring Kaur to produce additional evidence of ongoing trauma or psychological treatment to establish a claim to past persecution.").  But that does not mean that when such evidence of actual harm is presented, the BIA can choose to ignore it.

Finally, the agency failed to consider Javi's experience from the perspective of his relatively young age. We have called age a "critical" factor in assessing persecution for teenagers older than Javi, *see Singh v. Garland*, 57 F.4th at 654 (sixteen–eighteen-year-olds), and we have held that the agency commits legal error when it fails to "measure the degree of their injuries by their impact on children of their ages." *Hernandez-Ortiz v. Gonzales*, 496 F.3d 1042, 1046 (9th Cir. 2007); *see also Sangha v. I.N.S.*, 103 F.3d 1482, 1487 (9th Cir. 1997) (concluding that a fifteen-year-old boy was persecuted when his father was beaten, and the boy was forcibly recruited and threatened with death). The agency committed the same legal error here, which compounded the flaws in its past persecution analysis.

In light of the specific and menacing nature of M-18's death threat against Javi by men involved in the murder of his father, the violent near-confrontation at Javi and Candelaria's home by armed men soon thereafter, and the significant emotional trauma that Javi experienced as a fourteen-year-old and continues to endure, we conclude that the record compels a finding of past persecution.

## B.

Petitioners' past persecution claims also require them to show a causal nexus between their persecution and a protected ground. *See Rodriguez-Zuniga v. Garland*, 69 F.4th 1012, 1016 (9th Cir. 2023) (citations omitted). The protected grounds under the Immigration and Nationality Act ("INA") are "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 101(a)(42)(A); 8 U.S.C. § 1101(a)(42)(A).

Candelaria and Javi allege that their removal to El Salvador would result in persecution on account of their

status as immediate family members of Carlos Rodolfo Cornejo-Montano, which they contend qualifies as a "particular social group" under the INA.  Below, the agency assumed that Candelaria's and Javi's family membership qualifies as a particular social group, and DHS has not challenged that assumption on appeal.  "Because we are bound to consider only the grounds relied upon by the agency," we apply the same assumption.  *See Garcia v. Wilkinson*, 988 F.3d 1136, 1143 (9th Cir. 2021) (cleaned up).

Candelaria and Javi must therefore show a causal nexus between their past or feared future harm in El Salvador and their familial relationship to Carlos.  They seek relief under both asylum and withholding of removal, which have different nexus standards.  For withholding of removal, Candelaria and Javi must prove that a protected ground was "a reason" for their persecution, which means they must provide evidence that their persecutors were motivated "at least in part" because of their relationship to Carlos. *Barajas-Romero v. Lynch*, 846 F.3d 351, 358 (9th Cir. 2017).  For asylum, they must show that their relationship to Carlos was "one central reason" for the persecution, which is a more demanding standard.  8 U.S.C. § 1158(b)(1)(B)(i); *see also Barajas-Romero*, 846 F.3d at 360.  We have defined "one central reason" as "a reason of primary importance to the persecutors, one that is essential to their decision to act." *Manzano v. Garland*, 104 F.4th 1202, 1206–07 (9th Cir. 2024) (quoting *Rodriguez Tornes v. Garland*, 993 F.3d 743, 751 (9th Cir. 2021)).

Assessing whether an asylum applicant has met either nexus standard often requires acknowledging the possibility that persecutors may have mixed motives for their actions. *Barajas-Romero*, 846 F.3d at 357.  When the record reveals mixed motives for persecution, the one central reason

standard requires the protected ground to be "primary, essential, or principal." *Manzano*, 104 F.4th at 1207 (quoting *Kaur v. Garland*, 2 F.4th 823, 835 (9th Cir. 2021)). The protected ground cannot play a "minor role—that is, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Id.* (quoting *Kaur*, 2 F.4th at 835). "But a motive may be a central reason even if the protected ground was not the *only* reason for persecution." *Id.* (cleaned up) (quoting *Garcia*, 988 F.3d at 1143–44). "Indeed, that an unprotected ground *also* constitutes a central reason for persecution does *not* bar asylum." *Id.* (cleaned up) (quoting *Rodriguez Tornes*, 993 F.3d at 751).

There are at least two ways to demonstrate the causal link required to meet the "one central reason" standard. First, "a motive is a 'central reason' if the persecutor would not have harmed the applicant if such motive did not exist and the motive was more than 'incidental' or 'tangential.'" *Id.* (quoting *Rodriguez Tornes*, 993 F.3d at 751). Second, "a motive is a 'central reason' if that motive, standing alone, would have led the persecutor to harm the applicant." *Id.* (quoting *Rodriguez Tornes*, 993 F.3d at 751). In other words, a motive that is sufficient to cause the persecution meets the standard. *Id.* "Because a persecutor's actual motive is a matter of fact, we review that finding for substantial evidence." *Vasquez-Rodriguez v. Garland*, 7 F.4th 888, 893 (9th Cir. 2021) (cleaned up).

Here, the agency denied Petitioners relief under asylum and withholding of removal on the ground that they failed to establish a nexus between their alleged persecution and their status as immediate family members of Carlos Rodolfo Cornejo-Montano. In so doing, the agency failed to acknowledge the possibility of mixed motives. The agency instead reasoned that "the gang members' unsuccessful

attempt to recruit [Javi] does not establish a motivation to punish him or [Candelaria] for their family membership but rather a desire to enlist a new gang member into their ranks."

The agency erred by treating M-18's two alleged motives—targeting Javi to increase the size of M-18 and targeting him because of his status as Carlos's son—as mutually exclusive. On the contrary, the evidence compels the conclusion that Javi's and Candelaria's relationship to Carlos was "a reason of primary importance" to the gang members and was "essential to their decision" to target and threaten them. *Manzano*, 104 F.4th at 1206–07 (quoting *Rodriguez Tornes*, 993 F.3d at 751). Candelaria and Javi have met the "one central reason" standard for asylum, which means they have necessarily satisfied the weaker "a reason" standard for withholding of removal as well. *See Barajas-Romero*, 846 F.3d at 360.

As noted above, Candelaria explained that M-18 held a "grudge" against Carlos's family because of the family's perceived cooperation with the police after Carlos's murder. She then credibly testified—at least six times—that before confronting Javi the M-18 members had "investigated" him and determined that he was Carlos's son. For example, Candelaria explained that after the M-18 members who murdered Carlos were released from prison, they started investigating Javi, and then "investigated more." Candelaria testified that M-18 threatened Javi and his family because "they had already investigated and found out he was the son of [Chicharron]," Carlos's nickname. M-18's efforts to track down Javi and learn "everything about him"—and the fact that at least one of Carlos's convicted killers was involved in the gang's intimidation efforts and death threat—is powerful evidence that Javi's relationship to Carlos did not play a "minor role" and was not "incidental, tangential,

superficial, or subordinate to another reason for harm." *Manzano*, 104 F.4th at 1207 (quoting *Kaur*, 2 F.4th at 835).

Candelaria also testified that the M-18 members insulted Javi while confronting him by calling him the "faggot son" of Carlos, which is direct evidence of animus toward Javi precisely for his relationship to his father Carlos. And the record demonstrates that M-18 only began targeting Javi and Candelaria *after* his father's convicted killers were released from prison upon completion of their eight-year sentences, which reinforces Candelaria's testimony that M-18 targeted Javi because of their "grudge" against his family, and not solely for recruitment.

In short, Javi's familial status "caused the gang members to initiate their threats" and "remained front and center during his encounters with them." *Manzano*, 104 F.4th at 1210. The record compels the conclusion that Candelaria and Javi were targeted because of their relationship to Carlos.

In reaching this conclusion, we do not suggest that Javi's status as Carlos's son was the *only* reason M-18 targeted him. The record also supports the inference that M-18 targeted Javi to augment their ranks, as the agency concluded. The M-18 members forcefully demanded that Javi join their gang, and on cross-examination Candelaria admitted that M-18 often threatens boys and their families with death as a means of recruitment. For his part, Javi acknowledged that he "was not really sure" why the M-18 members targeted him. But even if M-18 was motivated in part by increasing the size of their gang, Javi's "persecution may [nevertheless] be caused by more than one central reason, and he need not prove which reason was dominant."

*Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062 (9th Cir. 2017) (en banc) (citation omitted).

We have cautioned against relying on false dichotomies in the nexus analysis. In *Parada v. Sessions*, for example, we found it "immaterial" that a guerrilla group's "attempted conscription" of the petitioner "would have served the dual goals of filling their ranks" and "retaliating against the [petitioner's] family" because "the latter is a protected ground, even if the former is not." 902 F.3d 901, 911 (9th Cir. 2018) (cleaned up); *see also Del Carmen Molina v. I.N.S.*, 170 F.3d 1247, 1250 (9th Cir. 1999) ("While the guerrillas' threats may have been motivated *in part* by an interest in recruiting her, this does not defeat [petitioner]'s asylum claim." (emphasis in original)). And in *Garcia v. Wilkinson*, we reversed the BIA for ignoring uncontradicted testimony that the persecutors, in addition to other motives, "specifically sought out the 'particular social group' of [the petitioner's] family." 988 F.3d at 1145 (quoting *Parada*, 902 F.3d at 909–10). Similarly here, the agency's nexus analysis ignored uncontradicted testimony that M-18— including the same man who was convicted of killing Carlos—targeted Javi and Candelaria because of their status as Carlos's family members.[4]

We hold that the record compels the conclusion that Candelaria's and Javi's relationship to Carlos was one central reason for their persecution. The weaker "a reason"

---

[4] DHS's counterargument largely rests on an overreading of *Rodriguez-Zuniga v. Garland*, 69 F.4th 1012 (9th Cir. 2023). The evidence of M-18's motive to persecute Candelaria and Javi based on their familial relationship is far more substantial here because a convicted murderer investigated, targeted, confronted, and then threatened the son of his prior murder victim.

standard is therefore necessarily satisfied.  *See Barajas-Romero*, 846 F.3d at 360.  We grant Candelaria's and Javi's petition for review as to the agency's nexus finding for both their asylum and withholding of removal claims.

## III.

We hold that Candelaria and Javi have established both that they suffered harm rising to the level of persecution and that they suffered such harm on account of a protected ground.  We remand for the agency to determine (1) whether the final element of the past persecution analysis, whether the persecution was committed by the government or by forces that the government was unable or unwilling to control, is satisfied, or (2) whether Petitioners have otherwise established a "well-founded fear of future persecution."  *See Hussain v. Rosen*, 985 F.3d 634, 645–46 (9th Cir. 2021).

**PETITION GRANTED IN PART AND DENIED IN PART; REMANDED.**

CALLAHAN, Circuit Judge, dissenting in part and concurring in part:

I concur in Parts I and II(B) of the majority opinion but otherwise respectfully dissent. While I agree the BIA erred in finding an insufficient causal nexus between Javi Alexander Cornejo-Corpeno's ("Javi") relationship to his father and being targeted by M-18, I dissent because Petitioners have not shown that the record compels a finding that their past experiences with M-18 in El Salvador were so extreme that they constituted persecution within the meaning of the Immigration and Nationality Act ("INA").

## I.

"Persecution, we have repeatedly held, is an extreme concept that means something considerably more than discrimination or harassment." *Sharma v. Garland*, 9 F.4th 1052, 1060 (9th Cir. 2021) (internal quotation marks and citation omitted). "Accordingly, some circumstances that cause petitioners physical discomfort or loss of liberty do not qualify as persecution, despite the fact that such conditions have caused the petitioners some harm." *Fon v. Garland*, 34 F.4th 810, 813 (9th Cir. 2022) (internal quotation marks and citation omitted).

As the majority acknowledges, determining whether a given set of negative experiences rises to the level of past persecution is "ultimately a fact-bound endeavor." *Sharma*, 9 F.4th at 1061. "When it comes to questions of fact—such as the circumstances surrounding . . . alleged persecution— the INA provides that a reviewing court must accept 'administrative findings' as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Garland v. Ming Dai*, 593 U.S. 357, 365

(2021) (quoting 8 U.S.C. § 1252(b)(4)(B)).   So, notwithstanding our court's vacillating prior statements of the standard, the Supreme Court directs that we review a denial of asylum due to failure to show past persecution for substantial evidence—not de novo.

The majority purports to apply substantial evidence review, but its analysis hardly resembles that "highly deferential" standard. *Ming Dai*, 593 U.S. at 365.  The majority identifies three supposed errors committed by the agency: (1) it "did not assess whether M-18 was, in fact, capable of carrying out its death threat against Petitioners" (Op. at 12); (2) it "failed to assess whether M-18's death threat caused Javi significant actual suffering or harm" (Op. at 14); and (3) it "failed to consider Javi's experience from the perspective of his relatively young age" (Op. at 16). While the BIA did not explicitly discuss each of these factors in its written decision, that does not necessarily mean it failed to consider these aspects of the case—as each would have been obvious to it.  Moreover, even assuming the agency erred in the ways the majority asserts, those legal errors would not permit the leap the majority then takes to impose *its own* view of the record on the agency.

After discussing the agency's purported legal errors at length, the majority holds in a single concluding sentence— with no comparison to past cases or discussion of the *Sharma* factors [1]—that the record compels a finding of past persecution.  In doing so, the majority exceeds the "carefully

---

[1] *See Sharma*, 9 F.4th at 1063 (identifying seven non-exhaustive factors for establishing past persecution, including "physical violence and resulting serious injuries, frequency of harm, specific threats combined with confrontation, length and quality of detention, harm to family and close friends, economic deprivation, and general societal turmoil").

circumscribed" bounds of our review of BIA decisions. *Ming Dai*, 593 U.S. at 365; *see also Prasad v. I.N.S.*, 47 F.3d 336, 340 (9th Cir. 1995) ("We are not permitted to substitute our view of the matter for that of the Board.").

## II.

## A.

First, the majority faults the agency for not assessing whether M-18 was "capable of carrying out" its threat to kill Javi and his family if Javi did not join their ranks. Op. at 12–13. But the BIA expressly acknowledged that death-threats-plus-harm may constitute persecution when made by one "capable of carrying out the threats." The BIA could not have failed to recognize the lethal power of M-18, as it was aware that members of M-18 had already killed Javi's father. Additionally, Petitioners' brief to the BIA confirmed what the agency already knew from the countless gang-related asylum claims from Central America that M-18 is "a powerful criminal gang infamous for brutality and cold-blooded killings." There is no reason to think the BIA found the death threat did not amount to persecution because M-18 was not *capable* of killing either of the Petitioners. Rather, as discussed in Section III, *infra*, the BIA could have reasonably discounted the seriousness of the threat because of the relatively short duration of the encounter and lack of accompanying violence.

## B.

Second, the majority holds the BIA erred by failing to assess whether M-18's death threat caused Javi actual suffering or harm. I do not agree. Citing *Duran-Rodriguez v. Barr*, the majority notes "credible death threats alone can constitute persecution." Op. at 12 citing 918 F.3d 1025,

1028 (9th Cir. 2019) (citing *Navas v. I.N.S.*, 217 F.3d 646, 658 (9th Cir. 2000). The majority, however, fails to acknowledge that death threats alone constitute persecution "in only a small category of cases . . . ." 918 F.3d at 1028 (citing *Lim v. I.N.S.*, 224 F.3d 929, 936 (9th Cir. 2000)). To qualify, a threat must be "so menacing as to cause significant actual suffering or harm." *Id.* In applying this precedent, the majority makes three significant errors: (1) the majority improperly shifts the focus from the threat itself to the claimed subjective harm of Petitioner; (2) the majority impermissibly assumes the agency did not consider the evidence of psychological harm despite record evidence to the contrary; and (3) the majority improperly determines Petitioner's PTSD diagnosis constitutes "significant actual suffering or harm" compelling a finding that the death threat amounts to past persecution.

### i.

The majority improperly diverts focus from the threat at issue to Petitioner's claimed subjective harm. Here, the harm is only relevant as a metric to determine whether the threat to Javi was "so menacing" as to qualify as past persecution. *Duran-Rodriguez*, F.3d 918 at 1028. This makes sense, for "'it is the conduct of the persecutor' that is relevant to evaluating whether past treatment rises to the level of persecution—not 'the level of harm' or 'subjective suffering' the petitioner experienced." *Antonio v. Garland*, 58 F.4th 1067, 1074 (9th Cir. 2023) (quoting *Flores Molina v. Garland*, 37 F.4th 626, 636 (9th Cir. 2022), in turn quoting *Kaur v. Wilkinson*, 986 F.3d 1216, 1226 (9th Cir. 2021)). Related evidence then—*e.g.* evidence of accompanying violence or, as relevant here, evidence of harm—may be used to determine the severity of the threat, but the ultimate focus must remain on the conduct of the perpetrator. In

accordance with this well-established principle, the BIA properly focused on the conduct of the gang members: their surrounding of Javi, grabbing him by the hands, and threatening him and his family with death if he did not join their ranks. Focusing on the threat and the circumstances surrounding it in the moment is not only required by our precedent but also a far more reliable way to determine persecution than focusing on an expert opinion of the applicant's mental state long after the fact.

The importance of this principle is highlighted by the instant case, where the claimed harm is a PTSD diagnosis, which is inherently subjective. By shifting the focus away from the threat to Javi's PTSD, the majority flouts our precedent and creates an inequitable rule. By way of example, take two similarly situated individuals: *Individual A* and *Individual B*. Both are told the same threat by the same perpetrator. *Individual A* is unaffected by the threat. *Individual B* is shaken by the threat and suffers PTSD as a result. Under the majority's analysis *Individual B* could establish past persecution based on the PTSD resulting from the threat. *Individual A*, however, though subject to the same threat, would be unable to establish past persecution. This result is unsupported by precedent and counter to well-established principles of asylum law requiring courts to focus on the conduct of the perpetrator, not the subjective psychological harm of the petitioner.

## ii.

The majority concludes "[i]n failing to address uncontradicted evidence that Javi currently experiences PTSD . . . the agency ignored the actual harm Javi continues to suffer . . . ." Op. at 14. This conclusion is belied by the record. There is no question the agency was aware of the

expert witness testimony and supporting documents discussing Javi's psychological state and diagnosis of PTSD. Indeed, as cited by the BIA in its review of the record, the IJ explicitly identified the expert witness testimony and the supporting documents as evidence it considered. Despite this fact, the majority maintains its unsupported assumption that the agency "failed to address" this evidence. This assumption and the resulting conclusion are wrong. Accordingly, the BIA did not err.[2]

### iii.

Undeterred by these initial errors, the majority takes one last flawed step in its threat analysis and determines Javi's PTSD diagnosis compels a finding of significant "actual suffering or harm." Op. at 14–16. This too is wrong. The majority cites no case where this court has ever found that a diagnosis of PTSD following a death threat establishes "actual suffering or harm" compelling the conclusion that a death threat constitutes persecution. Even worse, the majority cites no case where this court has ever found that any degree of psychological or emotional injury establishes "actual suffering or harm" compelling the conclusion that a death threat constitutes persecution. In fact, our line of death-threat cases do not turn on the degree of psychological

---

[2] Petitioners themselves do not raise this error in their briefs—which do not mention Javi's PTSD—and they did not argue to the BIA that the IJ erred in not discussing the PTSD diagnosis. That this argument was waived and unexhausted makes the majority's reversal particularly questionable. *See* 8 U.S.C. § 1252(d)(1) (exhaustion of administrative remedies); *Umana-Escobar v. Garland*, 69 F.4th 544, 550 (9th Cir. 2023) (enforcing § 1252(d)(1) as mandatory claim-processing rule under *Santos-Zacaria v. Garland*, 598 U.S. 411 (2023)); *Singh v. Ashcroft*, 361 F.3d 1152, 1157 n.3 (9th Cir. 2004) ("Issues not raised in an appellant's opening brief are typically deemed waived.").

suffering a given threat has inflicted on the survivor. Rather, we have exclusively evaluated death threats in the context of accompanying "evidence of violent confrontations, near-confrontations and vandalism" to determine whether a given threat is so severe as to amount to persecution. *Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir. 2004).

Despite this dearth of legal support, the majority attempts to say it does not break new ground because this court has long recognized that emotional and psychological harm may constitute "evidence of past persecution." Op. at 14–15. But the majority is doing something very different here. Here, the majority concludes a PTSD diagnosis establishes "actual suffering or harm" compelling the conclusion that a death threat constitutes persecution. The majority cites no case supporting this conclusion, and I have found none. This is the definition of breaking new ground whether the majority wishes to acknowledge it or not.

Contrary to the majority's novel opinion, the agency did not err. The record supports a conclusion that Javi's PTSD diagnosis falls outside the small number of cases where death threats alone constitute persecution. The agency's determination, thus, is consistent with our past decisions and supported by substantial evidence.

## C.

In its third and final claim of error, the majority faults the agency for failing to consider Javi's relatively young age in its past persecution analysis. True, the BIA's decision does not, on its face, refer to Javi's age at the time of the bus-stop attack. However, in describing the attack, the BIA cited to a three-page range of the hearing transcript wherein Candelaria stated that Javi was 14 years old at the time; and it was reviewing the IJ's decision which opened by stating

Javi's age (by then, 15 years old).  The BIA was certainly aware of Javi's youth when it upheld the IJ's finding of no past persecution.  The BIA clearly, if implicitly, considered Javi's age and I know of no authority that requires the BIA to say it did so explicitly.  Just because the BIA did not explain exactly how it weighed Javi's age does not mean that it did not consider his age—or that its conclusion is unsupported by substantial evidence.

What the majority really seems to be saying is that no reasonable fact finder who considered Javi's age could conclude he was not "persecuted."  But, given the limited number of Ninth Circuit death-threat cases involving children in their teens or younger, the BIA was not required to reach any particular conclusion as to the severity of Javi's encounters with M-18.  The three cases the majority cites regarding youthful victims involved objectively more severe attacks than what Javi experienced at the bus stop.  In *Hernandez-Ortiz v. Gonzales*, the applicant brothers based their claims on harms the Guatemalan army inflicted on their family members when the applicants were age seven and nine: beating and kidnapping their father and killing their older brother.[3]  496 F.3d 1042, 1044 (9th Cir. 2007).  In *Singh v. Garland*, the petitioner was twice physically attacked—first kicked and hit, next beaten with hockey sticks "all over his back and arms" and threatened with

---

[3] Unlike the present case, *Hernandez-Ortiz* was addressing a circumstance in which the applicants themselves were not targeted by the family's persecutors.  But we adopted a "legal rule that injuries to a family must be considered in an asylum case where the events that form the basis of the past persecution claim were perceived when the petitioner was a child."  *Id.* at 1046.  Thus, *Hernandez-Ortiz* does not speak to the agency's duty when considering the claim of a minor like Javi who is *directly* victimized.

death—when he was between ages 16 and 18.  57 F.4th at 649.   And in *Sangha v. I.N.S.*, the petitioner at age 15 witnessed four armed men break into his family's home and beat his father while demanding the father "give over" petitioner and his brother.  103 F.3d 1482, 1486 (9th Cir. 1997).

On this record, the BIA's failure to explicitly mention Javi's age does not compel the conclusion that it did not consider Javi's age in assessing the severity of his experience with M-18.

## III.

Reasonable minds can differ as to whether Javi's experience amounted to persecution under the INA.  Eight years after the murder of his father, when Javi was 14 years old, two men followed him at a distance on two separate occasions as he took the bus home from school.  There was no interaction, the men just watched him.  On a third occasion, while Javi was waiting for the bus, five or six men with "18" tattoos surrounded Javi and "grabbed him by the hands," "very hard".  As Javi would later learn, one or two of the assailants had been convicted of killing his father.  The attackers told him he "had to unite with them" and if he didn't join them, they would kill him and his family.  As people started to gather in the area, Javi managed to escape and run away.  Somewhere between three days and two weeks later, two of the attackers—at least one of whom Candelaria recognized as having been convicted of Carlos's murder—passed by and "stared at" Javi while he and Candelaria were selling food from their street cart outside their home.  Soon after, Candelaria fled with her children to her sister's house, and that night Candelaria's neighbor

called to tell her that (otherwise unidentified) armed men had entered her house and were "looking for someone."

Would this chain of events reasonably terrify a 14-year-old and his mother?  Would the record *support* a finding that this amounted to past persecution?  Yes, of course.  Would any reasonable fact finder be *compelled* to find this amounted to persecution under our precedent, however?  I do not think so.

## A.

"[P]ast-persecution analysis is best answered by comparing the facts of [a] [p]etitioner's case with those of similar cases."  *Singh*, 57 F.4th at 654 (internal quotation marks and citation omitted).  Viewed through the requisite deferential lens, substantial evidence supports the BIA's finding that Petitioners' experiences were not severe enough to constitute persecution when compared to prior death-threat cases.  For instance, the BIA compared this case to *Mashiri v. Ashcroft*, where we held past persecution was compelled based on the combination of a death-threat note "invok[ing] the terror of Germany's Nazi past," petitioner's tires being slashed, her home being "ransacked in a particularly violent way," petitioner having to run from a threatening mob, and violent attacks on all three of her immediate family members—all escalating over a period of six years.  383 F.3d at 1116–20.  That was the context of our observation—emphasized by the majority—that "threats may be compelling evidence of past persecution, particularly when they are specific and menacing and are accompanied by evidence of violent confrontations, near-confrontations and vandalism."  *Id.* at 1119; Op. at 12.

By comparison, a reasonable fact finder would not be compelled to find the gang members' actions toward Javi

equally "menacing" or "violent." For a few weeks, at most, gang members followed Javi from a distance and then on one occasion surrounded him and grabbed him, hard, by the hands. The record contains no suggestion that the men were armed in any fashion; and they did not physically harm Javi or even restrain him aggressively enough to prevent his escape. Of course, their vocal threat to kill him and his family if he did not join the gang makes the encounter more severe. As the majority repeatedly notes, "[d]eath threats alone *can* constitute persecution." *Kaur*, 986 F.3d at 1227 (emphasis added). However, those cases are rare, so rare in fact that this court has found none. *Duran-Rodriguez*, 918 F.3d at 1028 (noting death threats alone constitute "persecution in only a small category of cases") (internal quotation and citation omitted); *see also supra* Section II(B). Here, the agency was considering a single death threat, not repeated threats. And given that Javi was only briefly detained and there is no other evidence the assailants harmed Javi or his mother,[4] the evidence does not compel the majority's view that the threat was "so menacing" as to compel a finding of persecution. *Cf. Lim v. I.N.S.*, 224 F.3d 929, 936 (9th Cir. 2000) ("In certain extreme cases, we have held that repeated and especially menacing death threats can constitute a primary part of a past persecution claim . . . .").

## B.

Contrary to our congressionally-limited role, the majority views Petitioners' testimony in the most extreme light—assuming Carlos's murder eight years before the bus-stop attack and the home invasion shortly after Petitioners'

---

[4] As discussed below, the limited evidence of a home intrusion after Javi and Candelaria fled did not establish the identity of the intruders or their affiliation.

flight both compel a finding of past persecution. However, a reasonable fact finder would not necessarily consider Carlos's murder part of Javi's persecution. M-18 did not kill Carlos on account of his relationship to Javi (or Candelaria). He was killed for not being able to keep up with the gang's extortion demands—a tragic reason, but not one that compels the protection of our asylum laws. While Carlos's death was surely devastating to Javi, who was then 7 years old, Javi was not a witness to the killing. Further, he did not know his father was killed by gang members until his mother told him when he was older, and even then, she did not tell him why they had targeted his father. Thus, this is not a case of a death threat being made soon after the perpetrators have killed a petitioner's family member. *Cf. Navas v. I.N.S.*, 217 F.3d 646, 652, 658 (9th Cir. 2000) (finding past persecution compelled where 17-year-old was chased and shot at by Salvadoran soldiers who had just murdered his aunt, and who then threatened to kill him and his mother). In short, Carlos's killing was not necessarily part of Javi's alleged persecution.[5]

## C.

The majority makes yet another assumption by accepting that the armed men who reportedly entered Candelaria's home after she and her children had fled were M-18 members. There is very little in the record about this apparent break-in: just one sentence in one of Candelaria's declarations about the call she received from her neighbor. That sentence does not convey that Candelaria received any identifying information about the intruders, and the

---

[5] Nevertheless, Javi's relationship to Carlos clearly *motivated* the alleged persecution, as explained in Part II(B). of the majority opinion, in which I concur.

neighbor's perception that the intruders were "looking for someone" does not necessarily mean they were looking for Javi. Country conditions evidence offered by Petitioners reflects that El Salvador is "the most dangerous country in the world not engulfed in an ongoing war" and is plagued by violence from the Mara Salvatrucha (MS-13) gang in addition to M-18. The majority relies on its assumption that M-18 came looking for Javi that night to support its view that harm was imminent (Op. at 12–14, 16, 19–20), but the BIA was not required to make that same assumption.

One view of the record is that Javi experienced three instances of stalking, plus a non-violent confrontation with a death threat, followed by a stare-down on the sidewalk. Under that permissible view of the facts, the BIA could reasonably conclude that they did not amount to past persecution. *See, e.g.*, *Lanza v. Ashcroft*, 389 F.3d 917, 920–24, 934 (9th Cir. 2004) (upholding agency finding of no past persecution where three men broke into petitioner's house, pushed her, punched her, called her names, threatened to kill her and her young daughter, and continued to look for her after she fled).

## IV.

Evidence of Javi being attacked because he is Carlos's son could and should factor into a *fear-of-future*-persecution analysis. *See Lim*, 224 F.3d at 933, 935–36 (holding that a series of death threats by phone and letter did not compel past persecution but did trigger a well-founded fear of future persecution). Our unanimous holding that the causal nexus standard was satisfied (*see* Op., Part II(B)) means that, contrary to the IJ's finding, Petitioners were not merely asserting a fear of generalized violence by criminal elements. On remand, Petitioners should be given the

opportunity to establish a well-founded fear of persecution based on their familial relationship to Carlos.  However, this record does not compel that the burden should be flipped to DHS to rebut a *presumption* of future persecution.[6]

The majority reaches a conclusion that past persecution is compelled by ignoring evidence and precedent favorable to the BIA's view of the facts.  Although Candelaria and Javi have experienced great loss and frightening episodes in El Salvador, a reasonable fact finder could conclude that they were not "persecuted" within the meaning of the INA. Because the majority distorts existing precedent and supplants the BIA's substantially supported view of the facts with its own preferred version in holding past persecution was compelled, I concur only in Parts I and II(B) of the majority opinion and otherwise respectfully dissent.

---

[6] The majority appropriately remands this matter for the agency to determine whether the final element of a past persecution analysis— governmental inability or unwillingness to control the persecutors—is satisfied.  Thus, on remand the burden will not yet have shifted to DHS. But that shifting will result if Petitioners show that the El Salvadoran government is unable or unwilling to control M-18, as previous applicants have sometimes succeeded in demonstrating.  *See, e.g.*, *J.R. v. Barr*, 975 F.3d 778, 782 (9th Cir. 2020).